**IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

| | |
|---|---|
| STATE OF MISSOURI, STATE OF ARKANSAS, and STATE OF IOWA, | |
| *Petitioners*, | |
| v. | |
| MICHAEL REGAN, Administrator, U.S. Environmental Protection Agency, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and RADHIKA FOX, Assistant Administrator, U.S. Environmental Protection Agency, | No. 23-1787 |
| *Respondents.* | |

**INTERVENORS AMERICAN WATER WORKS ASSOCIATION'S AND NATIONAL RURAL WATER ASSOCIATION'S OPPOSITION TO RESPONDENTS' MOTION TO TRANSFER VENUE**

Intervenors the American Water Works Association and the National Rural Water Association (collectively, "Associations") oppose Respondents the U.S. Environmental Protection Agency, Michael Regan, and Radhika Fox's (collectively, "EPA's") motion to transfer the above-captioned petition to the U.S. Court of Appeals for the District of Columbia Circuit (hereinafter, "EPA Motion" or "EPA Mot.").

1

EPA issued a final, immediately effective rule titled "Addressing PWS Cybersecurity in Sanitary Surveys or an Alternate Process" ("Cybersecurity Rule"), https://tinyurl.com/mswu6xch. Contrary to EPA's characterization, the Cybersecurity Rule neither "establish[es]" nor "'pertains to' the establishment of" a national primary drinking water regulation ("NPDWR"). Instead, the Cybersecurity Rule changes the way public water systems ("PWSs") are audited for compliance with the Safe Drinking Water Act ("SDWA") by EPA and state regulators. The SDWA expressly permits this Court to review this "other final action" of EPA pursuant to 42 U.S.C. § 300j-7(a)(2). When considering the statute, the interests of the parties and congressional intent, this case is appropriate for this Court's resolution. This Court should therefore deny EPA's motion.

## BACKGROUND

### A.    What Are NPDWRs and How Are They "Established"?

The SDWA protects the nation's drinking water by, among other things, requiring EPA to establish regulations known as NPDWRs for contaminants that may pose health risks and are likely to be present in public water supplies. 42 U.S.C. § 300g-1(b)(1)(A). The SDWA distinctly defines NPDWRs as having four criteria, namely, that they (1) apply to PWSs; (2) specify contaminants which may have an adverse effect on the health of persons; (3) specify for each such contaminant either a numerical maximum contaminant level ("MCL") or a treatment technique that

2

sufficiently reduces the level of the contaminant in PWSs; and (4) contain criteria and procedures to assure a compliant supply of drinking water. 42 U.S.C. § 300f(1).

Before EPA "establishes" a NPDWR it takes several interim steps, some of which are final actions subject to judicial review. For example, every five years EPA must publish a list of unregulated contaminants that may require future regulation and make a preliminary determination of whether to regulate at least five contaminants. 42 U.S.C. § 300g-1(b)(1)(B)(i)(I), (ii)(I); *National Res. Def. Council v. EPA*, No. 20-1335, slip op. at 3–4 (D.C. Cir. May 9, 2023). Following the notice-and-comment period, EPA then makes a final regulatory determination as to whether to propose a NPDWR for the contaminants. 42 U.S.C. § 300g-1(b)(1)(A)(i)–(iii). After a positive determination, EPA then publishes a maximum contaminant level goal and promulgates a NPDWR. *Id.* § 300g-1(b)(1)(A). The SDWA subjects a decision not to regulate a particular contaminant to immediate judicial review. *See id.* § 300g-1(b)(1)(B)(ii)(IV).

EPA has issued NPDWRs for more than 90 contaminants, including regulations setting standards or treatment techniques for chemical contaminants such as lead, copper, and radionuclides; microorganisms such as total coliforms; and drinking water disinfectants and byproducts. *See Drinking Water Regulations: Overview*, EPA, https://tinyurl.com/yc6euzue (last visited May 30, 2023). EPA clearly titles these regulations "National Primary Drinking Water Regulations." *See*,

3

*e.g.*, National Primary Drinking Water Regulations: Lead and Copper Rule Revisions; Final Rule, 86 Fed. Reg. 4198 (Jan. 15, 2021); National Primary Drinking Water Regulations: Revisions to the Total Coliform Rule; Final Rule, 78 Fed. Reg. 10,270 (Feb. 13, 2013); National Primary Drinking Water Regulations; Radionuclides; Final Rule, 65 Fed. Reg. 76,708 (Dec. 7, 2000); National Primary Drinking Water Regulations; Disinfectants and Disinfection Byproducts; Final Rule, 63 Fed. Reg. 69,390 (Dec. 16, 1998).

EPA may issue NPDWRs either regulating new contaminants, *see*, *e.g.*, National Primary Drinking Water Regulations; Disinfectants and Disinfection Byproducts; Final Rule, 63 Fed. Reg. 69,390, 69,390 (Dec. 16, 1998) (setting first-time standards) or by revising NPDWRs for contaminants that EPA already regulates. *See*, *e.g*., National Primary Drinking Water Regulations: Lead and Copper Rule Revisions; Final Rule, 86 Fed. Reg. 4198 (Jan. 15, 2021) (revising the existing Lead and Copper NPDWR). These regulations all share the four requirements included in 42 U.S.C. § 300f(1) by selecting a contaminant, setting numerical limits or requiring treatment techniques to reduce the contaminant's occurrence in PWSs, identifying criteria and procedures for doing so, and applying those requirements to PWSs.

4

### B.     Sanitary Surveys and Other Implementing Regulations

By contrast, sanitary surveys do *not* establish NPDWRs and are not an interim step towards creating new NPDWRs. Instead, they implement and enforce the existing NPDWRs. Sanitary surveys are essentially compliance audits, defined as "onsite review of the water source . . . facilities, equipment, operation, maintenance, and monitoring compliance of a public water system to evaluate the adequacy of the system, its sources and operations and the distribution of safe drinking water." 40 C.F.R. §§ 141.2, 142.16(b)(3). States must conduct sanitary surveys for certain PWSs in order to secure and retain primary enforcement authority under the SDWA. *See* 40 C.F.R. §§ 142.16(b), 142.16(o).

Indeed, when EPA first established sanitary survey requirements, which EPA purports to interpret in the Cybersecurity Rule, it did not claim to establish a NPDWR. Rather, it explicitly titled them as "implementation" standards. *See* "National Interim Primary Drinking Water Regulation Implementation: Implementation of Standards" 41 Fed. Reg. 2916 (Jan. 20, 1976). The rule explained that sanitary surveys and other regulatory requirements were "Implementation Regulations" that "seek to implement the primary drinking water regulations." *Id.* Thus, from the beginning, EPA has distinguished between those rules which

5

*establish* NPDWR and those, such as sanitary survey regulations, that instead *implement* NPDWRs.

### C.    The SDWA's Judicial Review Provisions

Congress made similar distinctions when it revised the SDWA's judicial review provisions. Specifically, Congress set up a scheme where the D.C. Circuit would have exclusive jurisdiction to hear all actions "pertaining to the *establishment*" of NPDWRs while "*any other* final action of the Administrator under [the SDWA] may be filed in the circuit in which the petitioner resides or transacts business which is directly affected by the action." 42 U.S.C. § 300j-7(a) (emphasis added).[1] In doing so, Congress moved away from the previous jurisdictional scheme that dictated jurisdiction based on section-specific provisions, *see id.*; Pub. L. No. 93-523, 88 Stat. 1660, 1689 (1974), and towards a scheme that bifurcated judicial review over two distinct types of agency action: those that pertained to the *establishment* of NPDWRs and any other final agency actions. As noted by the 1986 amendments' legislative history, the purpose of this change was to broaden judicial review of EPA action beyond the D.C. Circuit. *See* S. Rep. No. 99-56 (1985).

---

[1] Congress has also provided federal district courts with original jurisdiction to review grants or refusals to grant variances from or exemptions to NPDWRs. *See* 42 U.S.C. § 300j-7(b); *id.* § 300g-4; *id.* § 300g-5. This separate jurisdictional provision is not at issue here.

Appellate Case: 23-1787    Page: 6    Date Filed: 06/05/2023 Entry ID: 5283645

Specifically, the Senate Committee Report notes that the previous advantages of judicial review in the D.C. Circuit:

> to the extent they exist, are insufficient to offset the disadvantages of centralized judicial review, which include inconvenience to litigants who do not reside in Washington, D.C. and an unwarranted concentration of power in a single tribunal, which may in turn generate undesirable political pressures on the appointment of judges. Centralizing review in a single court may also deprive the law of diverse views on complex legal issues, and as a result may make the task of the Supreme Court more difficult. Although other Circuit Courts of Appeal may not at present possess as much technical expertise as the D.C. Circuit, the responsibility of a Court of Appeals is to review regulations for conformity with law, not to undertake technical review of regulations.

*Id.* at *24–25.

### D. The Action at Issue Here

On March 3, 2023, EPA published the Cybersecurity Rule, along with a guidance document that purport to interpret existing sanitary survey requirements that EPA originally promulgated in a set of "Implementing Regulations" in 1976. The Cybersecurity Rule does not specify any contaminants to be regulated, does not specify maximum contaminant levels or treatment techniques for any existing contaminant, and therefore is not (and does not purport to be) a NPDWR. *See* 42 U.S.C. § 300f(1)(B)–(C). Instead, the Cybersecurity Rule adds substantive requirements to sanitary surveys by requiring an evaluation of PWSs' cybersecurity and operational technology. *See* Cybersecurity Rule at 3. And, rather than setting criteria or procedures focused on ensuring an adequate supply of drinking water from

7

a public health perspective, it focuses on hardware systems and technological elements of PWSs' operations such as password lengths, Microsoft Office macros or other similar embedded code, and USB devices. *See* Cybersecurity Guidance at A-1 to A-2.

On April 17, 2023, Petitioners timely petitioned for review of the Cybersecurity Rule as inconsistent with the SDWA and Administrative Procedure Act ("APA").

## ARGUMENT

### A. The D.C. Circuit Is Not the Exclusive Venue for this Action Because the Cybersecurity Rule Does Not Pertain to the Establishment of NPDWRs

    1.    The Cybersecurity Rule and Sanitary Survey Requirements Are Not NPDWRs.

The SDWA's jurisdictional provision channels petitions for review of "actions pertaining to the *establishment* of" NPDWRs to the D.C. Circuit, 42 U.S.C. § 300j-7(a)(1) (emphasis added), while petitions for review of "*any other* final action of the Administrator [of EPA]" may be heard by "the circuit in which the petitioner resides or transacts business which is directly affected by the action," *id.* § 300j-7(a)(2) (emphasis added). The SDWA then defines "primary drinking water regulation" to mean a regulation encompassing all of the following four elements:

(A) applies to public water systems;

8

(B) specifies contaminants which, in the judgment of the Administrator, may have any adverse effect on the health of persons;

(C) specifies for each such contaminant either—

(i) a maximum contaminant level . . . or [if the level is infeasible a] (ii) treatment technique known to the Administrator which leads to a reduction in the level of such contaminant . . . and

(D) contains criteria and procedures to assure a supply of drinking water which dependably complies with such maximum contaminant levels.

*Id.* § 300f(1)(A)–(D). The Cybersecurity Rule and sanitary survey regulations do not "specif[y] contaminants" or specify "a maximum containment level" or "treatment technique" for a particular contaminant. As a result, the Cybersecurity Rule—either itself or in connection with the sanitary survey regulations—is not a NPDWR as defined in the SDWA and generally understood.[2]

EPA focuses on paragraph (D) of the definition of "primary drinking water regulation," which covers "criteria and procedures to assure a supply of drinking water which dependably complies with such maximum contaminant levels." *Id.* § 300f(1)(D); *see* EPA Mot. 9. EPA contends that its sanitary survey regulations are

---

[2] EPA attempts to shift the focus of the present challenge to its sanitary survey regulations rather than the Cybersecurity Rule. *See* EPA Mot. 1. Even assuming *arguendo* that the Cybersecurity Rule is merely an interpretation of the sanitary survey regulations—albeit, one that imposes new substantive obligations, and is therefore legally and procedurally flawed—it would still not pertain to the establishment of a NPDWR because the sanitary survey regulations are not a NPDWR.

9

just such "procedures" and therefore constitute a NPDWR.[3] EPA glosses over the other necessary components of a NPDWR contained in paragraphs (B) and (C), which are joined by the conjunctive "and," *see* 42 U.S.C. § 300f(1)(A)–(D), meaning that a regulation must meet the components described in all four paragraphs in order to constitute a NPDWR. *See Erdahl v. Comm'r*, 930 F.2d 585, 591 n.8 (8th Cir. 1991) ("Because [26 U.S.C.] section 6013(e) is written in the conjunctive, all of its requirements must be met for the taxpayer to be eligible for innocent spouse relief."); *see also United States v. Palomar-Santiago*, 141 S. Ct. 1615, 1620–21 (2021). These other components require a NPDWR to "specif[y] contaminants which . . . may have any adverse effect on the health of persons," 42 U.S.C. § 300f(1)(B), and "specif[y] for each such contaminant either . . . a maximum containment level" or a "treatment technique . . . which leads to a reduction in the level of such contaminant sufficient to satisfy [42 U.S.C.] section 300g-1," *id.* § 300f(1)(C).

---

[3] EPA does not seek *Chevron* deference to support its reading of § 300f(1), and the Cybersecurity Rule does not engage "in the kind of interpretative exercise" of § 300f(1) "to which review under *Chevron* generally applies" even if not invoked by the agency. *See Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 22 (D.C. Cir.) (internal quotation marks omitted); *see also Hydro Res., Inc. v. EPA*, 608 F.3d 1131, 1146 (10th Cir. 2010) (en banc) (holding that an agency can waive *Chevron* deference). And deference is not warranted as the statute is clear that the Cybersecurity Rule does not meet all components of § 300f(1).

Appellate Case: 23-1787    Page: 10    Date Filed: 06/05/2023 Entry ID: 5283645

In other words, a NPDWR must not only contain criteria and procedures, but also set the MCLs and/or treatment standards that those criteria and procedures are intended to meet to "assure" attainment. *See Nebraska ex rel. Stenberg v. United States*, 238 F.3d 946, 947 (8th Cir. 2001) ("EPA drafts national primary drinking water regulations that establish the procedures *necessary to treat contaminants that pose an adverse effect on human health*.") (emphasis added) (citing 42 U.S.C. § 300f(1)). EPA's omission of the other necessary components of a NPDWR underscores its departure from clear congressional intent effectuated through the words Congress chose. *See Sanzone v. Mercy Health*, 954 F.3d 1031, 1040 (8th Cir. 2020), *as corrected* (Apr. 9, 2020). As noted above, the Cybersecurity Rule and sanitary survey regulations, even if construed as the types of "procedures" contemplated in paragraph (D) of 42 U.S.C. § 300f(1), lack those critical predicates, and simply are not NPDWRs.

Further, NPDWRs are focused on protecting public health through the reduction of contaminants in drinking water to acceptable levels. *See*, *e.g.*, 42 U.S.C. § 300f(1)(B) ("contaminants which . . . may have any *adverse effect on the health of persons*" (emphasis added)); *id.* § 300f(1)(C) ("treatment technique . . . which leads to a *reduction in the level of such contaminant* sufficient to satisfy the requirements of [42 U.S.C.] 300g-1") (emphasis added); *see also Nebraska v. EPA*, 331 F.3d 995, 997 (D.C. Cir. 2003) (characterizing NPDWRs as "establish[ing] enforceable

11

standards . . . limiting the amount of specified contaminants permitted in drinking water from public water systems"). The Cybersecurity Rule, by contrast, focuses on the security of PWSs and directs states as to how to conduct upcoming sanitary surveys. Nothing in the Rule purports to be aimed at reducing contaminant levels, or for use in future primary drinking water regulations with a similar aim.

> 2. Sanitary Survey Requirements and the Cybersecurity Rule Do Not Pertain to the "Establishment" of NPDWR But Rather Their Implementation and Enforcement.

EPA attempts to characterize its sanitary survey regulations as NPDWRs, and thus characterizes the Cybersecurity Rule as pertaining to the establishment of such regulations and therefore subject to § 300j-7(a)(1). *See* EPA Mot. 8–10. Yet, in its regulations and guidance, EPA has taken a different tack, describing its sanitary survey regulations as centered around the implementation and enforcement of existing NPDWRs. The sanitary survey regulations and Cybersecurity Rule therefore stand in contrast to the interim final actions EPA takes before it establishes a NPDWR, such as publishing a list of unregulated contaminants that may require future regulation and make a preliminary determination, 42 U.S.C. § 300g-1(b)(1)(B)(i)(I), (ii)(I), and making a final regulatory determination as to whether to propose a NPDWR for the contaminants, *id.* § 300g-1(b)(1)(A)(i)–(iii), or publishing a maximum contaminant level goal, *id.* § 300g-1(b)(1)(A).

12

In order for a state to obtain primary enforcement responsibility under the SDWA for the PWSs within its borders, the state must put in place a drinking water regulatory program meeting a litany of EPA-required components. *See* 42 U.S.C. § 300g-2; 42 C.F.R. part 142, subpart B. Such requirements include adopting drinking water regulations that are no less stringent than NPDWRs, 42 C.F.R. § 142.10(a), and "adequate procedures for the *enforcement* of such State regulations," including "[a] systematic program for conducting sanitary surveys of public water systems in the State," *id.* § 142.10(b)(2) (emphasis added). States must also have sufficient legal authority to require PWSs to respond to and address significant deficiencies identified in sanitary survey reports. *See id.* § 142.16(b)(1). Thus, despite EPA's current characterization of the nature of its sanitary survey regulations, the Agency's regulations confirm that they relate to the implementation and enforcement of existing NPDWRs, not their establishment. *See id.* §§ 142.10(b)(1)–(2), 142.16(b)(1).

In fact, EPA has long characterized sanitary surveys as a means of implementing and enforcing NPDWRs, not establishing them. When EPA published its 1976 regulations creating the sanitary survey requirements, *see* National Interim Primary Drinking Water Regulation Implementation, 41 Fed. Reg. 2916 (Jan. 20, 1976), it characterized the suite of regulations as "implementation regulations," rather than as establishing NPDWRs. *See id.* at 2916 ("The Implementation

13

Regulations promulgated here . . . seek to *implement* the primary drinking water regulations . . . ." (emphasis added)); *id.* (characterizing the proposed regulations as designed to "*implement* national primary drinking water regulations to be adopted pursuant to" the SDWA (emphasis added)). In doing so, EPA differentiated its implementation regulations from the "National Interim Primary Drinking Regulations," which had been previously promulgated at 40 Fed. Reg. 59,566 (Dec. 24, 1975). *Id.* And like with the text of the sanitary survey regulations, EPA characterized the sanitary survey requirements as centering on *enforcement* of the state's primary drinking water standards. *See id.* at 2917 (stating that for a state drinking water program to possess sufficient "statutory or regulatory enforcement authority," a state's "legal authority must include the power to seek injunctions against violations of the State's primary drinking water regulations" and "the right to enter and inspect public water systems"). Similarly, EPA titled its sanitary survey regulation "Implementation of Standards," *id.* at 2916, whereas NPDWRs are unambiguously designated as such when promulgated. *See*, *e.g.*, National Primary Drinking Water Regulations; Radionuclides; Final Rule, 65 Fed. Reg. 76,708 (Dec. 7, 2000).

Further, in 1999, EPA's Office of Water issued a "guidance manual" that stated that sanitary surveys "are carried out to evaluate: . . . the [public water] system's compliance with federal drinking water regulations." *See* EPA, *Guidance*

14

*Manual for Conducting Sanitary Surveys of Public Water Systems; Surface Water and Ground Water Under the Direct Influence (GWUDI) of Surface Water* 1-1, EPA No. 815-R-99-016 (Apr. 1999), https://tinyurl.com/mr2h9xn7.

> 3. The SDWA's Legislative History Confirms that Congress Intended for Judicial Review of Actions Like These to Extend Beyond the D.C. Circuit.

The purpose and statutory history of the SDWA's venue provisions confirms that Congress intended judicial review of actions like the Cybersecurity Rule that implement and enforce the NPDWRs to be available in circuits other than the D.C. Circuit.

The prior version read, in relevant part:

> (1) action of the Administrator in promulgating any [NPDWR] under section 1412, any regulation under section 1413(b)(1), any regulation under section 1414(c), any regulation for State underground injection control programs under section 1421, or any other general regulation for the administration of this title may be filed only in the United States Court of Appeals for the District of Columbia Circuit; and

> (2) action of the Administrator in promulgating any other regulation under this title, issuing any order under this title, or making any determination under this title may be filed only in the United States Court of Appeals for the appropriate circuit.

42 U.S.C. § 300j-7(a) (1974).

While EPA is correct that the pre-1986 amendment version of § 300j-7(a) explicitly identified a subset of statutory sections that could receive review only in the D.C. Circuit, the pre-1986 provision was not as narrow as EPA suggests. *See*

Appellate Case: 23-1787     Page: 15     Date Filed: 06/05/2023 Entry ID: 5283645

EPA Mot. 12. Indeed, the pre-1986 provision also gave exclusive jurisdiction to the D.C. Circuit of "any general regulation for the administration of this title." 42 U.S.C. § 300j-7(a)(1) (1974). Associations do not attempt to speculate as to what kinds of regulations these may have been, but the notably broad language suggests that the D.C. Circuit did have exclusive jurisdiction over more regulations than just those "promulgating any national primary drinking water regulation." EPA Mot. 12. Thus, the 1986 amendments did not expand the D.C. Circuit's exclusive jurisdiction, but rather narrowed it considerably to only those actions "pertaining to the establishment of" NPDWRs. All other final agency actions became eligible for review in any other federal circuit court. 42 U.S.C. § 300j-7(a)(2).

The legislative history of the 1986 amendments confirms that Congress intended to expand judicial review beyond the D.C. Circuit. As the bill's Senate Report noted: "Under current law [in 1985], judicial review is largely *limited* to the U.S. Circuit Court of Appeals for the District of Columbia." S. Rep. No. 99-56, at *24 (emphasis added). Although the Senate unsuccessfully tried to expand petitions for review for all SDWA actions in circuit courts other than the D.C. Circuit, *see id.*, its "principal purpose" in amending these jurisdictional provisions was "to allow the filing of applications for review of Safe Drinking Water Act agency actions in U.S. Courts of Appeals *other than the U.S. Court of Appeals for the District of Columbia*," *id.* (emphasis added). It reasoned further:

16

> [I]n the judgment of the Committee these advantages [regarding centralized judicial review], to the extent they exist, are insufficient to offset the disadvantages of centralized judicial review, which include inconvenience to litigants who do not reside in Washington, D.C. and an unwarranted concentration of power in a single tribunal, which may in turn generate undesirable political pressures on the appointment of judges. Centralizing review in a single court may also deprive the law of diverse views on complex legal issues, and as a result may make the task of the Supreme Court more difficult. Although other Circuit Courts of Appeal may not at present possess as much technical expertise as the D.C. Circuit, the responsibility of a Court of Appeals is to review regulations for conformity with law, not to undertake technical review of regulations.

*Id.* at *24–25.

EPA argues that Congress "rejected" the Senate's proposal to allow petitions for review for all SDWA actions in circuit courts other than the D.C. Circuit, but this overstates what actually occurred. *See* EPA Mot. 12. The Conference Committee modified it and incorporated the Senate's concerns about centralized power in one tribunal. *See* Ex. A, STAFF OF S. COMM. ON ENVIRONMENT AND PUBLIC WORKS, 103D CONG., A LEGISLATIVE HISTORY OF THE SAFE DRINKING WATER ACT AMENDMENTS, 1983–1992, at 205 (Comm. Print 1993) (noting that the conference agreement modifies the Senate provision).

Based on this reading of the 1986 amendments, affording review of the Cybersecurity Rule in the Eighth Circuit is consistent with congressional intent to divest review away from one centralized tribunal. The Eighth Circuit is more than capable of reviewing this action because it simply reviews EPA's conformity with

17

law and is not performing a technical review of regulations. *See* S. Rep. No. 99-56, at *24. Moreover, the Eighth Circuit, which covers Missouri, Arkansas, South Dakota, North Dakota, Iowa, Nebraska, and Minnesota and their 29,544 PWSs, also offers a more diverse view of this legal issue than a Circuit that covers only its one PWS. Furthermore, if this Cybersecurity Rule must undergo review exclusively in the D.C. Circuit, then every future memorandum, guidance, or agency action that purports to interpret any part of the SDWA or its regulations would have to similarly be reviewed in the D.C. Circuit. Such an outcome would almost assuredly result in "an unwarranted concentration of power in a single tribunal" contrary to congressional intent.[4] *Id.*

> 4. This Court's Prior Interpretations of 42 U.S.C. § 300j-7 Do Not Support Transferring This Petition to the D.C. Circuit.

Associations' reading of 42 U.S.C. §§ 300f(1) and 300j-7(a) is in keeping with this Court's previous decision in *Nebraska ex rel. Stenberg v. United States*, 238

---

[4] EPA's reliance on *Halogenated Solvents Industry Alliance v. Thomas*, 783 F.2d 1262, 1264 (5th Cir. 1986), to suggest that Congress intended national uniformity is misplaced as it was decided several months before Congress amended the SDWA jurisdictional provisions. *See* EPA Mot. 13.

This Court should reject EPA's suggestion that Congress desired centralized review over various SDWA actions based on a "similar judicial review provision" in the Clean Air Act ("CAA"), *see* EPA Mot. 14, as the relevant section of the CAA is much more robust in delineating actions that are subject to exclusive review in the D.C. Circuit. *See* 42 U.S.C. § 7607(b)(1).

18

F.3d 946 (8th Cir. 2001). In *Nebraska* this Court held that § 300j-7 required Nebraska's suit challenging the constitutionality of the SDWA to be brought in the D.C. Circuit. *See* 238 U.S. at 947, 949. In doing so, this Court determined that Nebraska was challenging a regulation that was indisputably a NPDWR—the Lead and Copper Rule, which required Nebraska PWSs to take certain actions to reduce levels of lead and copper in drinking water—under the guise of a constitutional challenge. *Id.*; *see* 40 C.F.R. § 141.80–.91 (2000). As this Court explained:

> In *Nebraska I,* Nebraska challenged the Lead and Copper Rule. After the district court dismissed *Nebraska I* for lack of jurisdiction, Nebraska filed suit again, only this time omitting references to the EPA's implementing regulations and instead casting its complaint as an "as-applied" challenge to the Act itself.

*Nebraska*, 238 F.3d at 949. Thus, Nebraska's suit more than "implicate[d]" the Lead and Copper Rule, *see id.* at 949, and was about more than "implementat[ion]" of the Lead and Copper Rule, *see* EPA Mot. 11. Instead, the legitimacy of the Lead and Copper Rule was the principal foundation of the challenge. *See Nebraska*, 238 F.3d at 949. This Court therefore found that Nebraska's challenge pertained to the establishment of a NPDWR.

The Cybersecurity Rule, by contrast, is not a NPDWR as defined in § 300f(1). *See supra* pp. 2–3. EPA contends that the Cybersecurity Rule "necessarily implicates" a NPDWR "to an even greater degree than in *Nebraska*" because "it articulates EPA's interpretation of their scope and meaning." EPA Mot. 11 (internal

Appellate Case: 23-1787    Page: 19    Date Filed: 06/05/2023 Entry ID: 5283645

quotation marks omitted). But what EPA is purportedly "interpreting" through the Cybersecurity Rule is not a NPDWR. EPA is instead "interpreting"—in reality, issuing an entirely new regulation—requirements for auditing PWSs to implement existing NPDWRs, rather than establishing new NPDWRs. It is, under EPA's theory, the *implementation* of an *implementation* regulation.

At least two of this Court's sister circuits have implicitly adopted this same dichotomy between actions "establishing" a NPDWR and those implementing and enforcing a NPDWR for purposes of determining venue. In *Manufactured Housing Inst. v. EPA*, the Fourth Circuit adjudicated a petition for review of a new EPA policy re-interpreting existing SDWA regulations to exempt certain properties from SDWA regulations. *See* 467 F.3d 391, 400–01 (4th Cir. 2006); Applicability of the Safe Drinking Water Act to Submetered Properties; Notice, 68 Fed. Reg. 74,233 (Dec. 23, 2003). Faced with a petition challenging EPA's limited application of its new policy to just apartment buildings and similar properties instead of properties such as large mobile home parks, the Fourth Circuit characterized this action (also presented in an agency memorandum like the Cybersecurity Rule), as "final action of the Administrator," and exercised original jurisdiction over the petition. *See Manufactured Housing Inst.*, 467 F.3d at 397 (citing 42 U.S.C. § 300j-7(a)(2)). In contrast, the Fifth Circuit reviewed regulations promulgated by the EPA that established recommended maximum contaminant levels and triggered a statutory

20

duty to "propose[] revised primary regulations . . . within 180 days." *Halogenated Solvents Indus. All. v. Thomas*, 783 F.2d 1262, 1264 (5th Cir. 1986) (citing 42 U.S.C. § 300g-1(b)(2)). The regulation at issue therefore required EPA to "establish" a revised NPDWR. Relying on the SDWA's previous jurisdictional provisions, the Fifth Circuit determined that the action belonged in the D.C. Circuit. *Id.* at 1265; *see also supra* note 4 and accompanying text.

**B.     This Petition Is Appropriate for Resolution by this Court**

Because the SDWA does not require this matter to be heard in the D.C. Circuit, this Court should respect Petitioners' chosen forum and Congress's intent to afford "diverse views on complex legal issues." S. Rep. No. 99-56, at *24. Ordinarily "courts give considerable deference to a plaintiff's choice of forum," and will "weigh any 'case-specific factors' relevant to convenience and fairness to the parties to determine whether transfer is warranted." *In re Apple, Inc*., 602 F.3d 909, 912–13 (8th Cir. 2010) (citing *Stewart Org., Inc. v. Ricoh Corp*., 487 U.S. 22, 29 (1988)). Here, relevant case-specific factors show that transfer to the D.C. Circuit is not warranted.

For example, Petitioners reside in the Eighth Circuit, exert primary enforcement authority over their PWSs in each of their States, and conduct the sanitary surveys that are at issue in this Petition. *See* Pet. for Review ¶¶ 20, 22, 24–25, 32–34, 39–41. EPA is neither prejudiced nor harmed by this Court's review

21

because it has regional offices in the Eighth Circuit and has litigated numerous times before this Court. *See*, *e.g.*, *Iowa League of Cities v. EPA*, 711 F.3d 844 (8th Cir. 2013); *City of Kennett v. EPA*, 887 F.3d 424 (8th Cir. 2018); *Nebraska ex rel. Stenberg v. United States*, 238 F.3d 946 (8th Cir. 2001). Additionally, this case will consist only of an electronic record review without any witnesses or document discovery. *See In re Apple, Inc.*, 602 F.3d at 913. And finally, this Petition is fundamentally about legal interpretations of the SDWA and APA that neither requires technical expertise nor a centralized tribunal. Thus, the Eighth Circuit is fully equipped and qualified to adjudicate this matter.

### C. If This Court Determines That It Does Not Have Jurisdiction, It Should Transfer Venue to the D.C. Circuit Rather Than Dismiss the Case

If this Court finds it lacks jurisdiction to review the Cybersecurity Rule, it should transfer the case to the D.C. Circuit rather than dismiss it because it is in the interests of justice to do so. *See* 28 U.S.C. § 1631.[5] Petitioners filed in this Court within the 45-day limitations period in good faith. Under similar circumstances, this Court has transferred rather than dismissed an action, and should do so here. *See*, *e.g.*, *Hempstead Cnty. & Nevada Cnty. Project v. EPA*, 700 F.2d 459, 463 (8th Cir.

---

[5] EPA has not sought dismissal of this action and did not provide a procedural basis for transferring this action, but presumably would seek to do so under 28 U.S.C. § 1631.

Appellate Case: 23-1787    Page: 22    Date Filed: 06/05/2023 Entry ID: 5283645

1983) (in the interest of justice to transfer rather than dismiss when original filing of the petition made in good faith and statute of limitations or filing period may have expired); *In re Apex Oil Co*., 884 F.2d 343, 346 (8th Cir. 1989) (transfer appropriate because court lacked jurisdiction, parties could have been confused as to the correct appellate procedure, and appeal would have been timely filed).

## CONCLUSION

This Court should deny EPA's motion to transfer this Petition to the D.C. Circuit. However, if this Court does find that it lacks jurisdiction to review the Petition, it should transfer the case to the D.C. Circuit without dismissal pursuant to 28 U.S.C. § 1631.

Date: June 5, 2023

Respectfully submitted,

*/s/ Corinne V. Snow*
Corinne V. Snow
Vinson & Elkins LLP
1114 Avenue of the Americas
32nd Floor
New York, NY 10036
Phone: (212) 237-0157
Email: csnow@velaw.com

*Counsel for American Water Works Association and National Rural Water Association*

23

## CERTIFICATE OF COMPLIANCE

1.      This motion complies with the word limit of Fed. R. App. P. 27(d)(2) because it contains 5187 words, excluding the parts exempted by Fed. R. App. P. 32(f) and 27(d)(2).

2.      This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

Date: June 5, 2023

Respectfully submitted,

*/s/ Corinne V. Snow* _____
Corinne V. Snow
Vinson & Elkins LLP
1114 Avenue of the Americas
32nd Floor
New York, NY 10036
Phone: (212) 237-0157
Email: csnow@velaw.com

*Counsel for American Water Works Association and National Rural Water Association*

1

## **CERTIFICATE OF SERVICE**

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that on June 5, 2023, I electronically filed the foregoing *American Water Works Association's and National Rural Water Association's Opposition to Respondents' Motion to Transfer Venue* with the Clerk of the Court for the U.S. Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system, and served copies of the foregoing via the Court's CM/ECF system on all ECF-registered counsel.

Date: June 5, 2023

Respectfully submitted,

*/s/ Corinne V. Snow*
Corinne V. Snow
Vinson & Elkins LLP
1114 Avenue of the Americas
32nd Floor
New York, NY 10036
Phone: (212) 237-0157
Email: csnow@velaw.com

2