No. 23-1787

# United States Court of Appeals
## For the Eighth Circuit

STATES OF MISSOURI, ARKANSAS, AND IOWA,

*Petitioners*,

AMERICAN WATER WORKS ASSOCIATION AND NATIONAL RURAL WATER ASSOCIATION,

*Intervenors*,

v.

MICHAEL REGAN, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY; U.S. ENVIRONMENTAL PROTECTION AGENCY, AND RADHIKA FOX, IN HER OFFICIAL CAPACITY AS ASSISTANT ADMINISTRATOR OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY,

*Respondents*.

**PETITIONING STATES' OPPOSITION TO MOTION TO TRANSFER VENUE**

This Court should deny Respondents' motion to transfer this case to the U.S. Court of Appeals for the District of Columbia because the petition does not challenge an "action[] pertaining to the establishment of national primary drinking water regulations (including maximum contaminant level goals)." 42 U.S.C. § 300j-7. The Petition challenges

Appellate Case: 23-1787    Page: 1    Date Filed: 06/05/2023 Entry ID: 5283946

the Cybersecurity Rule that expands what States must do to audit Public Water Systems (PWSs) to "evaluate the adequacy of the cybersecurity of [] operational technology for producing and distributing safe drinking water." Pet. Attachment, Dkt. No. 5266116, at 2–3. These requirements are not intended "to assure a supply of drinking water which dependably complies with such maximum contaminant levels," 42 U.S.C. § 300f(1)(D), but to assess "the operation and maintenance of the system," § 42 U.S.C. §300i-2 (a)(1)(A)(vi). *See* Dkt. No. 5266116, at 2 ("Clarifying that cybersecurity must be evaluated in reviewing operational technology that is part of a PWS's equipment or operation during sanitary surveys or other state programs will help reduce the likelihood of a successful cyber-attack on a PWS and improve recovery if a cyber incident occurs.").

The Petition claims that EPA's final action violates the Administrative Procedure Act because it is a legislative rule that must conform with notice-and-comment procedures, exceeds EPA's statutory authority (thus violating the SDWA), and is arbitrary and capricious. Pet. ¶ 51. The Petition does not claim that the Cybersecurity Rule establishes a National Primary Drinking Water Regulation (NPDWR), and the Cybersecurity Rule does not meet the statutory definition of a

NPDWR in 42 U.S.C. § 300f (1). The rule does not "specif[y] contaminants which … may have any adverse effect on the health of persons," state a "maximum contaminant level," or contain "criteria and procedures to assure a supply of drinking water which dependably complies with such maximum contaminant levels." 28 U.S.C.§ 300f(1)(B)–(D). The Rule fails to mention any contaminant or any maximum contaminant level. As such, the States do not challenge any "actions pertaining to the establishment of" NPDWRs and instead challenge "any other final action of the Administrator under this chapter." 28 U.S.C. 300j-7(a).

Respondents claim that any "interpretation" of a sanitary survey requirement is an action "pertaining to the establishment of the [NPDWRs]" and that the legislative history shows that the 1986 amendment of § 300j-7 to include "pertaining to" broadened the D.C. Circuit's exclusive authority to hear SDWA cases. EPA Mot. at 9–10, 12–13. Neither is correct. First, the Cybersecurity Rule does not pertain to the "establishment" of NPDWRs, but adds requirements to the States' implementation and enforcement of existing NPDWRs. Respondents' view reads "establishment" out of the statute entirely. Second, the

legislative history confirms the States' statutory reading is correct, in that the "principal purpose" in amending these jurisdictional provisions was "to allow the filing of applications for review of Safe Drinking Water Act Agency actions in U.S. Courts of Appeals other than the U.S. Court of Appeals for the District of Columbia." S. Rep. No. 99-56, at *24.[1]

Venue is proper in this Court[2] because the Petition challenging the Cybersecurity Rule does not pertain to the establishment of a NPDWR.

## Argument

I. **The SDWA's text confirms that the Cybersecurity Rule does not pertain to the establishment of national primary drinking water regulations.**

The Cybersecurity Rule does not meet the statutory definition of a "national primary drinking water regulation[]," in 42 U.S.C. § 300(f)(1). Nor does it comply with the substantive and procedural requirements common to establishing national primary drinking water regulations

---

[1] To conserve judicial resources, the Petitioning States will not address this point further but join and adopt the Intervenors' careful analysis showing that the 1986 amendment expanded judicial review of SDWA petitions in other Circuits. Intervenors' Opp. at 6, 15–18.

[2] To the extent the Court determines otherwise, transfer under 28 U.S.C. § 1631 is a proper remedy. *See, e.g.*, *Hempstead Cty. & Nevada Cty. Project v. EPA*, 700 F.2d 459, 463 (8th Cir. 1983) (transfer rather than dismissal appropriate when original filing of petition made in good faith and statute of limitations or filing period may have expired).

found in 42 U.S.C. § 300g-1. Both the Cybersecurity Rule and other sanitary survey requirements Respondents cite do not relate to establishing drinking water regulations but rather enforcing them.

The relevant statutory text in the judicial review provision is not "pertaining to" but "the establishment of national primary drinking water regulations." Establishment, is the "act of establishing," means "[t]o cause (an institution, for example) to come into existence or begin operating." Establishment & Establish, The American Heritage dictionary of the English language, 608 (5th ed. 2018); *accord* Establish, Black's Law Dictionary (11th ed. 2019) ("2. To make or form; to bring about or into existence."). So the D.C. Circuit only has exclusive jurisdiction and venue under 42 U.S.C. 300j-7(a)(1) over petitions that challenge actions concerning the making or causing of an NPDWR to come into existence. Indeed, Respondents concede that "an action that merely *applies* regulations would not pertain to their establishment." EPA Mot. at 10 (emphasis in original).

The Act defines an NPDWR as a regulation which "(A) applies to public water systems; (B) specifies contaminants which… may have any adverse effect on the health of persons;" "(C) specifies for each such

contaminant either" "a maximum contaminant level" or "each treatment technique known to the Administrator" to sufficiently reduce such contaminant; and "(D) contains criteria and procedures to assure a supply of drinking water which dependably complies with such maximum contaminant levels." 42 U.S.C. § 300f(1). The "criteria and procedures" include "accepted methods for quality control and testing procedures to insure compliance with such levels and to insure proper operation and maintenance of the system," and minimum water quality intake and new facility siting criteria. *Id.*

As explained more fully in Intervenors' Opposition, establishing an NPDWR requires several findings including identifying a contaminant that may have an adverse health effect on humans, establishing a "maximum contaminant level" or sufficient treatment techniques, and listing feasible technologies to achieve those levels. Intervenors' Opp. at 10–11; *see* 42 U.S.C. § 300g-1 (b)(1)–(11). When proposing or promulgating an NPDWR, EPA also must publish a host of information and determinations simultaneously. 42 U.S.C. § 300g-1(a)(3). As commonly accepted, NPDWRs "establish[] enforceable standards, called maximum contaminant levels, limiting the amount of specified

contaminants permitted in drinking water from public water systems."[3] *Nebraska v. EPA*, 331 F.3d 995, 997 (D.C. Cir. 2003). The

Applied here, the Cybersecurity Rule does not meet the criteria for an NPDWR or a regulation that concerns causing an NPDWR to come into existence. The challenged rule does not specify a contaminant or a maximum contaminant level, and therefore does not contain procedures to assure that a water supply "complies with *such* maximum contaminant levels." 42 U.S.C. § 300f(1)(D) (emphasis added). The Cybersecurity Rule does not mention a contaminant or even the word "contaminant." It also does not comply with any other requirement for promulgating an NPDWR. *See* 42 U.S.C. § 300g-1(a)(3). The rule similarly fails to reference an NPDWR that has begun to operate or been brought into existence. In short, the Cybersecurity Rule does not pertain to the establishment of an NPDWR.

Respondents claim that a "primary drinking water regulation" includes "not just the standards or treatment applied to drinking water but also 'procedures to assure a supply of drinking water' that will comply

---

[3] Petitioning States note that NPDWRs may under certain circumstances require certain treatment techniques. 42 U.S.C. § 300f(1)(a)(C)(ii).

with those levels and 'insure proper operation and maintenance of the system.'" EPA Mot. at 9. And they allege that "primary drinking water regulation" includes the requirements for conducting a sanitary survey. *Id.* But this misreads § 300f(1)(D) by claiming that an NPDWR need only satisfy one part of the statutory definition. Under that view, any regulation that "applies to a public water system" is an NPDWR. *See* 42 U.S.C. § 300f(1)(A). That is surely incorrect.

Respondents' incorrect statutory reading also underpins their claim that a "sanitary survey" is an NPDWR. EPA Mot. at 9–10. Respondents contend that because Part 141 contains a definition for "sanitary survey," *see* 40 CFR § 141.2, and what components a sanitary survey must evaluate, *id.* § 141.401, that sanitary survey regulations are NPDWRs. EPA Mot. at 9. But this argument fails to connect these regulations to § 42 U.S.C. § 300(f)(1)'s requirements that an NPDWR must specify the contaminant and a maximum contaminant level (or treatment technique). Moreover, the term sanitary survey and its requirements are not found solely in Part 141. Sanitary survey is also defined in 40 C.F.R. § 142.2, and Part 142 contains "regulations for the *implementation and enforcement* of the national primary drinking water regulations

contained in part 141 of this chapter." 40 C.F.R. § 142.1 (emphasis added); *see also* 40 C.F.R. § 142.16(b)(3)(i) (stating components of sanitary survey). As a result, where these regulations reside in the Federal Register is not probative here.

Other statutory provisions indicate that the Cybersecurity Rule (or the sanitary survey regulations) are not NPDWRs. *First*, in the most relevant section, "criteria and procedures" appears only once describing circumstances when filtration is required as a treatment technique for public water systems supplied by surface water sources. 42 U.S.C. § 300g-1(b)(7)(C). That section does not include any requirements to test, monitor, or maintain systems without reference to also referring to a maximum contaminant level or a contaminant. *See id.* § 300g-1(b)(4)(E)(ii)(III). In contrast, that provision entitled "National drinking water regulations," requires EPA to regulate certain contaminants by name. *Id.* § 300g(b)(12). It is inconsistent with the statutory scheme under § 300g and the definition in § 300f to claim that any criteria or procedure may be an NPDWR.

*Second,* Congress enacted laws relating to cybersecurity and infrastructure of PWSs, and those provisions are not contained in § 42

U.S.C. § 300g-1. The closest provision in the U.S. Code to the NPDWR section requires EPA and CISA to develop a "prioritization framework" and "support plan" for Congress on security risks to PWSs. 42 U.S.C. § 300g-10(a) & (b)(1). But this provision does not "alter[] the existing authorities of the Administrator." *Id.* § 300g-10(c). Congress specifically legislated cybersecurity and security requirements for public water systems[4] (serving more than 3,300 persons). Subsection 300i-2(a)(1)(A)(ii) requires large community water systems to "conduct an assessment of the risks to" the system including the security of "electronic, computer, or other automated systems." A different subsection requires those PWSs to make an emergency response plan that includes "strategies and resources to improve the resilience of the system, including the physical security and cybersecurity of the system." *Id.* § 300i-2(b)(1). These provisions specifically relate to the security and cybersecurity of PWSs and are separate from the statutory section related to promulgating NPDWRs. All statutory indications show that

---

[4] Petitioning States note that all Community Water Systems are PWSs. 42 U.S.C. § 300(f)(15) ("The term "community water system" means a public water system … .")

neither the Cybersecurity Rule nor the regulations related to sanitary surveys are NPDWRs or pertain to the establishment of any NPDWR.

II. **EPA's regulations show that the Cybersecurity Rule implements and enforces NPDWRs but does not establish them.**

Respondents characterize the Cybersecurity Rule as pertaining to an NPDWR, but EPA's regulations differentiate between establishing an NPDWR and enforcing those requirements. Like the statutory scheme, the regulations show that the Cybersecurity Rule and similar requirements for sanitary surveys[5] relate to the enforcement, not establishment, of NPDWRs.

From its regulation creating sanitary survey requirements, EPA explained that these regulations were "implementation regulations." 41 Fed. Reg. 2916 (Jan. 20, 1976) ("The Implementation Regulations promulgated here . . . seek to *implement* the primary drinking water regulations . . . ."); *id.* (characterizing the proposed regulations as designed to "*implement* national primary drinking water regulations to

---

[5] Respondents claim that the theory of the case does not contest that "the sanitary survey is part of the national primary drinking water regulations." EPA Mot. at 10. This is incorrect, the States did not claim that the sanitary survey requirements met the definition of an NPDWR in 42 U.S.C. § 300f(1).

be adopted pursuant to" the SDWA (emphasis added)).  The regulations also focused on the sanitary survey requirements serving as an enforcement mechanism to ensure compliance with a state's primary drinking water standards.  *See id.* at 2917 (explaining state's "legal authority must include the power to seek injunction against violations of the State's primary drinking water regulations" and "the right to enter and inspect public water systems").  EPA also titled its sanitary survey regulation "Implementation of Standards," National Interim Drinking Water Regulation Implementation: Implementation of Standards." *Id.* at 2916.

That well-established view has continued through recent years, where EPA explains that "[a] sanitary survey serves as an important and proactive public health measure, identifying areas that are in need of additional attention and resources or improved performance by the PWS to ensure *continuing compliance* with the National Primary Drinking Water Regulations (NPDWR) as well as State regulations and requirements." Office of Water, EPA, *How to Conduct a Sanitary Survey of Drinking Water Systems: A Learner's Guide*, at 1 (Aug. 2019) (emphasis

added);[6] *see also* Office of Water, EPA, *Guidance Manual for Conducting Sanitary Surveys of Public Water Systems; Surface Water and Ground Water Under the Direct Influence (GWUDI) of Surface Water*, EPA No. 815-R-99-016 (Apr. 1999).[7]

In contrast, when EPA promulgates an NPDWR, it does not mince words. *E.g.*, *National Primary Drinking Water Regulations; Arsenic and Clarifications to Compliance and New Source Contaminants Monitoring*, 66 Fed. Reg. 6,976 (Jan. 22, 2001) ("Arsenic Rule") ("Today EPA is establishing … an enforceable Maximum Contaminant Level (MCL) for arsenic of 0.01 mg/L (10 Mug/L)."); *see also National Primary Drinking Water Regulations; Radionuclides; Final Rule*, 65 Fed. Reg. 76,708 (Dec. 7, 2000). EPA plainly announces when it is "establishing" an NPDWR. *Arsenic Rule*, 66 Fed. Reg. at 6,981 ("The regulation not only establishes an MCLG and MCL for arsenic, but also lists feasible technologies and affordable technologies for small systems that can be used to comply with the MCL."). And it does so, in part, because when an NPDWR is established, primacy States must also change their drinking water

---

[6] *Available at* https://www.epa.gov/sites/default/files/2019-08/documents/sanitary_survey_learners_guide_508_8.27.19.pdf.
[7] *Available at* https://tinyurl.com/mr2h9xn7.

regulations. *See* 40 C.F.R. § 142.16(a)(1) ( Under State's legal authority it must "adopt[] drinking water regulations which are no less stringent than the national primary drinking water regulations (NPDWRs)."). And again, any such regulation differentiates between establishing and enforcing NPDWRs, because States must adopt "adequate procedures for the enforcement of such State regulations," including "[a] systematic program for conducting sanitary surveys of public water systems in the State." *Id.* § 142.10(b)(2). States must also ensure that their "[s]tatutory or regulatory enforcement authority" includes "[a]uthority to apply State primary drinking water regulations to all public water systems in the State covered by the national primary drinking water regulations." *Id.* § 142.10(b)(6)(i). These regulations confirm that the Cybersecurity Rule cannot be mistaken for an NPDWR.

This Court has relied on EPA's practice of clearly announcing when it establishes an NPDWR. *State of Neb. ex rel. Stenberg v. United States*, 238 F.3d 946, 949 (8th Cir. 2001). In that case, the Court ruled that constitutional challenges to EPA's regulations establishing the Lead and Copper NPDWR must be brought in the D.C. Circuit. But there, EPA's regulation "*establishes* a treatment technique that requires public water

systems to monitor the levels of lead and copper at consumers' taps." *Id.* at 947 (emphasis added). When Nebraska first sued in this Circuit, the petition was dismissed because it challenged both the SDWA and the Lead and Copper Rule. *Id.* The district court explained that "[s]tripping the complaint of references to the EPA's [Lead and Copper Rule] does not change the result." *Id.* The Eighth Circuit affirmed on the basis that constitutional challenges to enabling acts "necessarily implicate[] the EPA's regulations" and must be brought in the D.C. Circuit.

This comports with decisions by sister circuits. Under the previous version of 42 U.S.C. § 300j-7, the Fifth Circuit reviewed regulations promulgated by the EPA that "establish[ed] recommended maximum contaminant levels (RCMLs) for certain volatile, synthetic organic chemicals in public water systems." *Halogenated Solvents v. Thomas*, 783 F.2d 1262, 1264 & n.1 (5th Cir. 1986). EPA argued that "RMCLs are an integral part of the primary regulations and therefore fall within the grant of exclusive jurisdiction to the D.C. Circuit." *Id.* Setting aside the broader provision for judicial review in the D.C. Circuit, RMCL's are an integral part of an NPDWR, because a "maximum contaminant level specified in a revised national primary drinking water regulation for a

contaminant shall be as close to the [RMCL] established under [§ 300g–1(b)(1)(B) ] for such contaminant as is feasible." *Id.* at 1264 (alterations in original). And as the Court knows, NPDWR must specify a maximum contaminant level. 42 U.S.C. § 300f(1)(C)(ii). Thus, because EPA "was charged with developing and issuing revised primary regulations," *Halogenated Solvents*, 783 F.2d at 1264, and the RMCLs were integral to establishing the maximum contaminant in a revised RPDWR, the petition belonged in the D.C. Circuit, *id.* at 1265.[8]

In a more analogous case, the Fourth Circuit adjudicated a petition for review of a new EPA policy re-interpreting existing SDWA regulations to exempt certain properties from SDWA regulations. *See Manufactured Housing Inst. v. EPA,* 467 F.3d 391, 400–01 (4th Cir. 2006). EPA's memorandum interpreted the word "sell" in 42

---

[8] The Fifth Circuit ultimately deferred to the agency's interpretation of the statute in such a "close case." *Id.* Respondents have not argued for such deference, and it is unwarranted here. *See Hydro Res., Inc. v. EPA*, 608 F.3d 1131, 1146 (10th Cir. 2010) (en banc) (holding that an agency can waive *Chevron* deference). The statute is unambiguous as to what constitutes an NPDWR, and EPA has failed to show that the Cybersecurity Rule or the sanitary survey requirements meet all four components of the Act's definition. Moreover, given that Congress has legislated on security requirements for PWSs, there is no statutory silence to interpret and any deference belongs to Congress, not EPA.

U.S.C. § 300g(3) and stated that the Act would not apply to apartment buildings. *Id.* at 396. Unlike here, EPA submitted the rule to notice-and-comment procedures, *id.* at 396, but like this case, EPA's action was formalized in memorandum form, *Applicability of the Safe Drinking Water Act to Submetered Properties Docket: OW-2003-0065*, 68 Fed. Reg. 74,233 (Dec. 23, 2003). Notably, no specific NPDWR was affected. The Fourth Circuit found that the memorandum was a final agency action and exercised original jurisdiction over the petition. *Manufactured Housing Inst.*, 467 F.3d 3d at 397 (citing 42 U.S.C. § 300j-7(a)(2)).

This Petition does not challenge the promulgation or establishment of an NPDWR. It challenges the Cybersecurity Rule which fails to cite any Rule or regulation that limits or specifies any particular contaminant. No Lead and Copper Rule, Arsenic Rule, Radionuclides Rule, or similar NPDWR will be affected by ruling in Petitioning States' favor. And Petitioners fail to cite any NPDWR that specifies a contaminant adverse to the public health (as 42 U.S.C. § 300(f)(1)(B) requires) that could be affected here. As a result, the Petition clearly challenges "any other final action" and venue is proper in this Court.

## Conclusion

For the foregoing reasons, the Court should deny Respondents' motion to transfer the Petition to the U.S. Court of Appeals for the District of Columbia.

Dated: June 5, 2023

Respectfully submitted,

**ANDREW BAILEY**
Missouri Attorney General

*/s/ Jeff P. Johnson*

Jeff P. Johnson, Mo. Bar No. 73249
  Deputy Solicitor General
Richard Groeneman,
Mo. Bar No. 57157
Timothy Duggan, Mo. Bar No. 27827
  Assistant Attorneys General
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (314) 340-7366
Fax: (573) 751-0774
Jeff.johnson@ago.mo.gov
*Counsel for Petitioner State of Missouri*

| | |
|---|---|
| **TIM GRIFFIN** <br> Arkansas Attorney General <br><br> Nicholas Bronni <br> Solicitor General <br> Dylan L. Jacobs <br>  Deputy Solicitor General <br> Michael A. Cantrell <br>  Assistant Solicitor General <br> Arkansas Attorney General's Office <br> 323 Center Street, Suite 200 <br> Little Rock, AR 72201 <br> Phone: (501) 682-2007 <br> Dylan.jacobs@arkansasag.gov <br> *Counsel for Petitioner* <br> *State of Arkansas* | **BRENNA BYRD** <br> Iowa Attorney General <br><br> Eric H. Wessan, IA #AT0014313 <br>  Solicitor General <br> Iowa Attorney General's Office <br> 1305 E. Walnut Street <br> Des Moines, IA 50319 <br> Phone: (515) 823-9117 <br> eric.wessan@ag.iowa.gov <br><br><br><br><br><br> *Counsel for Petitioner* <br> *State of Iowa* |

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

                                     */s/ Jeff P. Johnson*
                                     Jeff P. Johnson

## CERTIFICATE OF COMPLIANCE

I hereby certify that this response complies with the typeface and formatting requirements of Fed. R. App. P. 27 and 32, and that it contains 3,241 words as determined by the word-count feature of Microsoft Word.

                                     /s/ *Jeff P. Johnson*