IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

| | |
|---|---|
| STATE OF MISSOURI, *et al.*, <br><br> Petitioners, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al*. <br><br> Respondents. | No. 23-1787 |

# **REPLY IN SUPPORT OF MOTION TO TRANSFER**

The Cybersecurity Memorandum at issue in this petition for review directly interprets the scope of the national primary drinking water regulations promulgated by the Environmental Protection Agency ("EPA") under the Safe Drinking Water Act ("SDWA"). The Memorandum sets forth EPA's interpretation that when required sanitary surveys of public water systems are conducted, those surveys must assess the vulnerability of those systems' operational technology to cyberattacks.

Sanitary surveys are an integral part of EPA's national primary drinking water regulations. EPA's interpretation of the necessary scope of sanitary surveys is thus about the *meaning* of those regulations—that is, what those regulations *establish*. The Memorandum accordingly "pertain[s] to" the establishment of

1

national primary drinking water regulations and, under 42 U.S.C. § 300j-7(a)(1), may be challenged only in the D.C. Circuit.

Petitioners the State of Missouri, *et al.* ("State Petitioners") and Intervenors American Water Works Association *et al.* ("Associations") incorrectly contend that the States' petition instead seeks review of "any other final action," 42 U.S.C.§ 300j-7(a)(2), and thus that venue in this court is proper. But in so contending, Petitioners misconstrue the Memorandum, the sanitary survey requirements EPA is interpreting, and the SDWA's legislative history.

For the reasons set forth in EPA's Motion to Transfer and herein, the Memorandum is an action "pertaining to the establishment of national primary drinking water regulations" reviewable only in the D.C. Circuit. 42 U.S.C. § 300j-7(a)(1). The Court should grant EPA's motion and transfer venue to that court.[1]

**I.     The Memorandum Interprets Sanitary Survey Requirements, Which Are an Inextricable Component of National Primary Drinking Water Regulations, and Is Thus Reviewable Only in the D.C. Circuit.**

EPA's Cybersecurity Memorandum states the Agency's interpretation of "the regulatory requirements relating to the conduct of sanitary surveys" of public water systems. Memorandum at 2 (citing 40 C.F.R. §§ 141.2, 142.16(b)(3), and

---

[1] EPA understands that pursuant to the Court's June 7, 2023 Order, EPA's motion to transfer venue, including the responses and reply thereto, will be taken with the case for consideration by the panel to which this case is submitted for disposition on the merits.

142.16(o)(2)). While sanitary survey requirements are referenced in many places in EPA's SDWA regulatory framework, they are, as pertinent here, incorporated directly into and promulgated as national primary drinking water regulations themselves. *See, e.g.*, 40 C.F.R. §§ 141.21(a)(2)–(3), 141.82(j)(1)(vi), 141.401, 141.700(c)(7); *see also, e.g., id*. § 141.723 (requirement to respond to significant deficiencies identified in sanitary surveys, initially promulgated as part of EPA's National Interim Primary Drinking Water Regulations, 40 Fed. Reg. 59,566 (Mar. 14, 1975)). EPA established sanitary survey requirements directly within its "national primary drinking water regulations" to effectuate Congress's direction that such regulations include "criteria and procedures to assure a supply of drinking water which dependably complies with" the regulations' substantive contaminant limitations or treatment techniques. 42 U.S.C. § 300f(1)(D).

It is true, as the State Petitioners and Associations argue, that sanitary surveys are not referenced *solely* within EPA's national primary drinking water regulations, which are set forth in Part 141 of Title 40 of the Code of Federal Regulations. States' Resp. at 8; Associations Resp. at 12. They are also referenced within EPA's implementing regulations, as set forth in Part 142. But the fact remains that requirements to conduct sanitary surveys, and different treatment, monitoring, or other requirements based on the results of sanitary surveys, are contained within, and are a component of, the national primary drinking water

3

regulations themselves. For example, as a part of the "treatment technique" mandated as an alternative to a maximum contaminant level for microbial pathogens for some public water systems, EPA's Groundwater Rule, codified at 40 C.F.R. § 141.400 *et seq.*, requires "[r]egular [ground water system] sanitary surveys to check for significant deficiencies in eight key operational areas." National Primary Drinking Water Regulations: Ground Water Rule, 71 Fed. Reg. 65,574, 65,577 (Nov. 8, 2006); *see* 40 C.F.R. §§ 141.400(c)(1), 141.401.

Similarly, EPA's Interim Enhanced Surface Water Treatment Rule to address cryptosporidium establishes sanitary survey requirements for certain systems. National Primary Drinking Water Regulations: Interim Enhanced Surface Water Treatment, 63 Fed. Reg. 69,478, 69,494 (Dec. 16, 1998); *see* 40 C.F.R. § 141.171(b)(6). EPA "established" these rules and others in the same process that the Associations describe in their response (at 2–4), and those rules include requirements to conduct and to use the results of sanitary surveys. In other words, sanitary survey requirements are an element of national primary drinking water regulations, and "established" as such in the Ground Water, Surface Water, and other rules. *See, e.g.*, *supra* p.3.

Accordingly, the Associations err in suggesting, based on characterizations of the preamble to EPA's 1976 rule relating to Part 142, that sanitary surveys are *only* a means of implementing and enforcing the national primary drinking water

4

regulations, rather than a part of those regulations. Associations Resp. at 13–14. EPA does not dispute that the Part 142 regulations are implementing regulations. But EPA has never characterized its Part 141 National Primary Drinking Water regulations as "implementing regulations." And as relevant here, sanitary surveys are a component of those Part 141 regulations.

The fact that the sanitary survey requirement is *one part* of those national primary drinking water regulations that does not in itself specify maximum contaminant levels does not affect the venue analysis under section 300j-7(a). *Contra* States Resp. at 7–8; Associations Resp. at 10–11. The regulations described above and others that include sanitary survey requirements are national primary drinking water regulations that meet all four of the definitional criteria set forth in 42 U.S.C. § 300f, including specifying contaminants that may have adverse health effects and maximum contaminant levels or other treatment techniques. The statutory text refutes Petitioners' view that the venue analysis under section 300j-7(a) would turn on the particular part of the regulations at issue that petitioners challenge, rather than the nature of the regulation as a whole. That is particularly true in light of Congress's use of the broadening term "pertaining to" in section 300j-7(a)(1). A challenge to just one portion of a national primary drinking water

5

regulation—or, as here, an action interpreting that portion of the regulation—is still challenging an action "pertaining to the establishment of" that regulation.

The fact that the challenged Cybersecurity Memorandum is interpretive in nature and does not itself "establish" national primary drinking water regulations—or any other regulation, for that matter—is also not material to the venue analysis. Congress mandated that the D.C. Circuit review all final actions "*pertaining to*" the establishment of national primary drinking water regulations (emphasis added). EPA's interpretation of the requirements of its national primary drinking water regulations is, to state the obvious, an explanation of what those regulations establish. The Memorandum thus "pertain[s]" to the establishment of those regulations, even though it does not itself establish a new a regulation. Accordingly, State Petitioners' focus on the word "establishing" in the SDWA venue provision, States Resp. at 3–4, misses the mark. EPA has, in fact, *established* contaminant-specific national primary drinking water regulations that explicitly incorporate and depend on sanitary surveys. The Cybersecurity Memorandum challenged here "pertain[s] to" the establishment of those regulations because it interprets the requirements of those sanitary surveys.

Likewise, Petitioners are misguided in suggesting (States Resp. at 2 and Associations Resp. at 12) that cybersecurity bears no relationship to public water systems' ability to meet maximum contaminant levels. As EPA explained in the

Appellate Case: 23-1787   Page: 6   Date Filed: 06/12/2023 Entry ID: 5286093

Memorandum, sanitary surveys are intended to "identify threats to public health before they materialize." Memorandum at 8. Malicious cyber activity that interferes with the operational technology of public water systems has the "potential to compromise the treatment and distribution of safe drinking water." *Id.* at 2. Addressing cybersecurity therefore ensures that public waters systems meet the substantive, contaminant-control requirements of the national primary drinking water regulations.

Finally, the claims that State Petitioners intend to raise in challenging the lawfulness of the Cybersecurity Memorandum are irrelevant under the SDWA's venue provision. State Petitioners contend that because they do not "claim that the Cybersecurity Rule establishes a National Primary Drinking Water Regulation," they are not challenging any "actions pertaining to the establishment of" such regulations. States Resp. at 2–3. But the SDWA determines venue based on the characteristics of the challenged *action*, not the scope of a petitioner's claims about that action. *See Nebraska ex rel. Stenberg v. United States*, 238 F.3d 946 (8th Cir. 2001) (holding that venue was proper in the D.C. Circuit because plaintiff's suit "necessarily implicates the EPA's regulations"); *cf. ATK Launch Sys.*, 651 F.3d at 1197 (holding that, under the Clean Air Act venue provision that determines venue on the national or regional applicability of the challenged action, "this court must analyze whether *the regulation itself* is nationally applicable, not whether the

7

effects complained of or the petitioner's challenge to that regulation is nationally applicable" (emphasis added).

## II. Legislative History and Caselaw Precedent Support Transfer to the D.C. Circuit.

State Petitioners' and the Associations' appeal to legislative history and caselaw is similarly unavailing. Although the 1986 amendments to the SDWA expanded the kinds of actions reviewable in circuit courts other than the D.C. Circuit, those amendments retained exclusive D.C. Circuit review of actions relating to the establishment of national primary drinking water regulations. Indeed, even as Congress removed review of regulations regarding state primacy enforcement responsibilities (SDWA section 1413(b)(1), 42 U.S.C. § 300g-1(b)(1)), certain enforcement provisions (SDWA section 1414(c), 42 U.S.C. § 300g-3(c)), and underground injection control programs (SDWA section 1421, 42 U.S.C. § 300h) from section 300j-7(a)(1), it expanded the language relating to national primary drinking water regulations from those actions "in promulgating" such regulations to actions "*pertaining to* the establishment of" those regulations. *See* Pub. L. 93-523, § 2(a), 88 Stat. 1698 (Dec. 16, 1974) (emphasis added). Thus, even if the amendments demonstrate Congress's intent to expand the jurisdiction of

courts outside the D.C. Circuit in some specific areas, that expansion does not affect the analysis here. The legislative history instead squarely supports transfer.

The cases State Petitioners describe also do not support their venue argument. This Court's decision in *State of Nebraska ex rel. Stenberg v. United States*, 238 F.3d 946 (8th Cir. 2001), endorses the idea that courts should look to the agency action rather than the nature of a petitioner's challenge to that action to determine appropriate venue. Here, that action is the Cybersecurity Memorandum, which, as explained above, interprets requirements that are inextricably intertwined with and, in multiple cases, express components of national primary drinking water regulations. Like in *Stenberg*, the petition for review here "necessarily implicates" those regulations and therefore must be heard in the D.C. Circuit. *Id.* at 949.

Similarly, in *Halogenated Solvents Industry Alliance v. Thomas*, 783 F.2d 1262 (5th Cir. 1986), the Court, applying the pre-1986 amendments venue provision, determined that a challenge to recommended maximum contaminant levels that informed the maximum contaminant level set forth in a national primary drinking water regulation belonged in the D.C. Circuit in part because the recommended maximum contaminant levels "are national in scope," and thus "it comports with congressional intent to find that their review may be had only in the D.C. Circuit." *Id.* at 1265. The Fifth Circuit contrasted that national scope with "secondary regulations" that, because they "may vary according to geographic or

9

other circumstances," "rationally should be subject to review in the circuit court for the particular region affected." *Id*. Applying that logic here, it is appropriate to find that the Cybersecurity Memorandum is an action "pertaining to the establishment of national primary drinking water regulations" because it, too, articulates EPA's interpretation of nationally applicable and nationally uniform provisions of its SDWA regulations.

Finally, State Petitioners are incorrect that the Fourth Circuit's decision in *Manufactured Housing Institution v. EPA*, 467 F.3d 391 (4th Cir. 2006), is the most analogous case to the present petition. That case involved EPA's interpretation of whether apartment houses that used submetering—in essence, billing tenants for their individual water usage—were "selling" water within the meaning of the SDWA and thus subject to SDWA regulations. *Id*. at 395–96. In other words, there EPA was interpreting the scope of *who* is subject to regulation under SDWA section 1411, 42 U.S.C. § 300g, not the *content* of those regulations themselves. Here, EPA's interpretation is of requirements of the national primary drinking water regulations. Unlike the action at issue in *Manufactured Housing Institution*, therefore, this case belongs in the D.C. Circuit.

## CONCLUSION

EPA requests that the Court transfer venue over this petition to the D.C. Circuit.

Dated: June 12, 2023

Of Counsel:
PETER Z. FORD
EPA Office of General Counsel
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

Respectfully submitted,

TODD KIM
Assistant Attorney General

/s/ *Sarah A. Buckley*
SARAH A. BUCKLEY
Trial Attorney
U.S. Department of Justice
Environment & Natural Res. Div.
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
(202) 616-7554
sarah.buckley@usdoj.gov

Counsel for Respondents

11

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULES OF APPELLATE PROCEDURE 27(D) & 32(A)

This motion complies with the requirements of Fed. R. App. P. 27(d)(2) because it contains 2,082 words, excluding any accompanying documents authorized by Fed. R. App. R. 27(a)(2)(B).

This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Sarah A. Buckley
SARAH A. BUCKLEY

## CERTIFICATE OF SERVICE

I hereby certify that June 12, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ *Sarah A. Buckley*
SARAH A. BUCKLEY