No. 23-____

# United States Court of Appeals
## For the Eighth Circuit

STATES OF MISSOURI, ARKANSAS, IOWA,

*Petitioners*,

v.

MICHAEL REGAN, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE
U.S. ENVIRONMENTAL PROTECTION AGENCY; U.S. ENVIRONMENTAL
PROTECTION AGENCY, AND RADHIKA FOX, IN HER OFFICIAL CAPACITY AS
ASSISTANT ADMINISTRATOR OF THE U.S. ENVIRONMENTAL PROTECTION
AGENCY,

*Respondents*.

**FILED**
APR 17 2023
MICHAEL GANS
CLERK OF COURT

# 23-1787

## PETITION FOR REVIEW

1.  The U.S. Environmental Protection Agency appears to believe
that "cooperative federalism" means EPA issues orders and States must
fall in line—or else. EPA's March 3, 2023 Cybersecurity Rule requires
States to change how they conduct sanitary surveys under the Safe
Drinking Water Act and imposes increased technology costs on small
(and rural) Public Water Systems. EPA's new authority springs from re-
"interpreting" the words "equipment" and "operation" for a physical on-
site inspection to include cybersecurity infrastructure, even though the

**RECEIVED**
APR 17 2023
U.S. COURT OF APPEALS
EIGHTH CIRCUIT

words "cybersecurity" or "internet" are absent from the 2019 guidance. And EPA uses its new power to require a mandatory enforcement scheme that burdens States and rural Public Water Systems. EPA's six-page checklist and sixteen new "significant deficiencies" exemplify its unlawful tradition of creating new legal obligations and labeling them guidance.

2. EPA promulgated this rule without any statutory or Congressional support. By claiming to reinterpret its authority, EPA seeks to evade (rather than obey) the procedures required for promulgating a new rule. EPA's actins impose costs on everyone now and waits to see how long it takes courts to notice and set them straight. But the federal government must follow the rules like everyone else. The Administrative Procedure Act and other statutory obligations cannot be reduced to a speed bump so easily avoided.

3. EPA also ignores the scheme by which Congress intended to regulate cybersecurity under America's Water Infrastructure Act of 2018 (AWIA), which requires only community water systems serving over 3,300 people to, among other actions, assess the risk and resilience of "electronic, computer, or other automated systems (including the security

of such systems)." And for systems over 3,300 people, Congress specifically required that *EPA* (and not the States) retain these certifications, stating that "[n]o community water system shall be required under State or local law to provide an assessment described in this section (or revision thereof) to any State, regional, or local governmental entity solely by reason of the requirement set forth in paragraph (3) that the system submit a certification to the Administrator." *See* 42 U.S.C. § 300i-2. And EPA's Cybersecurity Rule recognizes that the AWIA "does not provide for any review of the risk and resilience assessments by states, nor does it require water systems to adopt specific cybersecurity practices to reduce risks identified during the risk and resilience assessments." But in this Cybersecurity Rule, EPA attempts to shift those requirements (as determined by EPA) onto the States.

4.    EPA's new rule thus intrudes on States' sovereignty. States have historically regulated drinking water within their borders. Unlike Congress, States are not limited in the exercise of their power by having to show a nexus with interstate commerce, they can simply regulate environmental matters under the police power. The Safe Drinking Water

Act reflects this State-first statutory scheme and specifically empowers States to be the primary enforcers. But EPA's lawless actions place States' traditional role in jeopardy, because failing to impose EPA's new burdens permits EPA to pull millions in funding and takeover enforcement.

5.    This Petition for Review asks the Court to hold unlawful and set-aside EPA's March 3, 2023 Cybersecurity Rule requiring States to impose new and burdensome cybersecurity infrastructure mandates on Public Water Systems.

## Parties

6.    Respondent the U.S. Environmental Protection Agency is a federal agency responsible for implementing and enforcing certain environmental statutes. EPA is an executive agency and an agency within the meaning of 5 U.S.C. § 551(1). EPA issued the March 3, 2023 Cybersecurity Rule and is a Department of the United States.

7.    Respondent Michael Regan is the Administrator of the EPA. He is responsible for and supervises EPA's statutory obligations and activities. The Administrator is also granted various authorities under the Safe Drinking Water Act. He is sued in his official capacity.

8.    Respondent Radhika Fox is the Assistant Administrator of the EPA and signed the March 3, 2023 Cybersecurity Rule. She is sued in her official capacity.

9.    The State of Missouri is the twenty-fourth State admitted to the Union in 1820 and holds all privileges of a sovereign State. It has primary enforcement authority under 42 U.S.C. § 300g-2 and retains its traditional sovereign powers.

10.    Andrew Bailey is the 44th Attorney General of Missouri, and as Missouri's chief legal officer, he may "institute, in the name and on the behalf of the state, all civil suits and other proceedings at law or in equity requisite or necessary to protect the rights and interests of the state, and enforce any and all rights, interests or claims against any and all persons, firms or corporations in whatever court or jurisdiction such action may be necessary." Mo. Rev. Stat. § 27.060.

11.    The State of Arkansas is the twenty-fifth State admitted to the Union in 1836 and holds all privileges of a sovereign State. It has primary enforcement authority under 42 U.S.C. § 300g-2 and retains its traditional sovereign powers.

12.     Tim Griffin is the 57th Attorney General of Arkansas, and as the Arkansas's chief legal officer he is empowered to "maintain and defend the interests of the state in matters before the United States Supreme Court and all other federal courts."  Ark. Code Ann. 25-17-703(a).

13.     The State of Iowa is the twenty-ninth State admitted to the Union and was admitted in 1846.  It holds all the privileges of a sovereign State.  It has primary enforcement authority under 42 U.S.C. § 300g-2 and retains its traditional sovereign powers.

14.     Brenna Bird is the 34th Attorney General of Iowa and as Iowa's chief legal officer has the duty to "[p]rosecute and defend in any other court or tribunal, all actions and proceedings . . .in which the state may be a party or interested, when, in the attorney general's judgment, the interest of the state requires such action[.]"  Iowa Code § 13.2.

## **VENUE AND JURISDICTION**

15.     Jurisdiction is proper because this action arises under and is authorized by 42 U.S.C. § 300j-7 that permits a challenge to "any other final action of the Administrator" under the Safe Drinking Water Act. *See also* Fed. R. App. 15(a).

16.     The Cybersecurity Rule is a final action by the Administrator because it marks the "consummation" of the agency's decision-making process and is an action from which "rights or obligations have been determined," or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  Specifically, the Cybersecurity Rule now requires States to alter their sanitary survey and uses mandatory language that leads private parties and State authorities to believe it will declare certain acts invalid or noncompliant.

17.     The Cybersecurity Rule therefore puts States and Public Water Systems on notice that they risk an EPA enforcement action if they choose not to—or cannot—comply.  *See, e.g., U.S. Army Corps of Eng'rs v. Hawkes Co.*, Inc., 578 U.S. 590, 597–601 (2016).  The Cybersecurity Rule reflects a position that EPA plans to follow and insists that State authorities comply with it.  The Assistant Administrator stated that "EPA is taking action to protect our public water systems by issuing this memorandum requiring states to audit the cybersecurity practices of local water systems."

18.     The Cybersecurity Rule is subject to the Administrative Procedure Act because it is a legislative rule.  *See* 5 U.S.C. §§ 551, 706;

*Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 855 (8th Cir. 2013), *enforced sub nom. Iowa League of Cities v. Env't Prot. Agency*, No. 11-3412, 2021 WL 6102534 (8th Cir. Dec. 22, 2021).

19.    This final agency action directly affects the States because it regulates their activities under the Safe Drinking Water Act.

20.    Venue is proper in the U.S. Court of Appeals for the Eighth Circuit because Missouri, Arkansas, and Iowa reside in this Circuit.  42 U.S.C. § 300j-7(a)(2).

21.    This Petition for Review is timely because the Administrator's final action was on March 3, 2023 and effective immediately, and the Petition is filed within 45 days of the "promulgation of the regulation or any other final Agency action with respect to which review is sought or on the date of the determination with respect to which review is sought." 42 U.S.C. § 300j-7(a)(2).

## STANDING

22.    Missouri has more 2,700 public water systems.  Although it is conceivable that all of these public water systems could be subject to the Cybersecurity Rule, Missouri estimates that more than 1,000 public water systems are affected by the rule change.  There are also 1,427

community public water systems that must comply with Missouri's Water Safety and Security Act, Mo. Rev. Stat. §§ 640.141–640.145.

23.     The Cybersecurity Rule imposes significant costs to Missouri's Department of Natural Resources, including additional staff hours and resources that would be required to complete each sanitary survey due to EPA's new cybersecurity rule.

24.     Missouri completes approximately 800 sanitary surveys each year.  It estimates that implementing EPA's new requirements for sanitary surveys would require between two and six additional hours for each survey.

25.     Missouri has primary enforcement responsibility in the state under the Safe Drinking Water Act. 42 U.S.C. § 300g-2(a).  On an annual basis, "the Administrator shall review, with respect to each State determined to have primary enforcement responsibility, the compliance of the State with the requirements set forth in 40 CFR part 142, subpart B, and the approved State primacy program."  40 C.F.R. § 142.17(a)(1). When the Administrator determines, based on this review "or other available information," that a state no longer meets the regulatory

requirements for primacy, "the Administrator shall initiate proceedings to withdraw primacy approval." 40 C.F.R. § 142.17(a)(2).

26.   The primacy program requires that Missouri adopt and implement adequate procedures to include a "systematic program for conducting sanitary surveys of public water systems in the State." 40 C.F.R. § 142.10(b)(1). States must also have the authority to require a public water system (PWS) to respond to and address significant deficiencies identified in sanitary survey reports. *See* 40 C.F.R. § 142.16(b)(1).

27.   The March 3 Cybersecurity Rule substantively changes "the duties of states during PWS sanitary surveys, which states are required to perform under 40 CFR §§ 141.2, 142.16(b)(3) and 142.16(o)(2)." Rule at 7. "Sanitary surveys must evaluate those aspects of the PWS within the eight required components that are necessary for the production and distribution of safe drinking water," *Id.* at 8, that now include the cybersecurity of any operation technology used by a PWS. And "States must have the appropriate rules or other authority to assure that PWSs respond in writing to significant deficiencies outlined in sanitary survey reports." 40 C.F.R. § 142.16(b)(1)(ii). Failing to adopt EPA's new

cybersecurity requirements when conducting a sanitary survey may trigger a withdrawal of primacy under 40 C.F.R. § 142.17(a)(2) and prevent a State's re-application for primacy. 40 C.F.R. § 142.16(o)(2) (In addition to other requirements, "a primacy application must describe how the State will implement a sanitary survey program that meets the requirements of paragraph (o)(2)(i) of this section.").

28.    The loss of primacy has substantial consequences. "Whenever the Administrator makes a final determination pursuant to section 300-2g(b) of this title that the requirements of section 300g-2(a)of this title are no longer being met by a State, additional grants for such State under this subchapter shall be immediately terminated by the Administrator." 42 U.S.C. 300j-12(a)(1)(F). Missouri estimates that the loss of primacy would jeopardize more than $100 million in grants and funding.

29.    Additionally, EPA's Cybersecurity Rule attempts to supplant the Missouri Water Safety and Security Act, Mo. Rev. Stat. §§ 640.141–640.145.    Acting pursuant to its traditional police powers, Missouri requires community water systems to "create a plan that establishes policies and procedures for identifying and mitigating cyber risk.  The plan shall include risk assessments and implementation of appropriate

controls to mitigate identified cyber risks." Mo. Rev. Stat. § 640.142. Missouri community water systems that comply with the Act likely do not comply with EPA's new Cybersecurity Rule that, in one option, requires public water systems to address eight topics and thirty-three specific questions during a sanitary survey. Thus, EPA's new cybersecurity requirements nullify Missouri law in the exercise of its traditional sovereign powers.

30. Arkansas has hundreds of community water systems, all of which could conceivably be affected by the Cybersecurity Rule. Arkansas estimates that more than 500 small community water systems will be affected by the rule change.

31. The Cybersecurity Rule imposes significant costs on the Arkansas Department of Health, including additional staff hours and resources that would be required to complete each sanitary survey due to EPA's new cybersecurity rule.

32. Arkansas completes approximately 200–300 sanitary surveys each year. It estimates that implementing EPA's new requirements for sanitary surveys would require between two and six additional hours for each survey.

33.     Arkansas has primary enforcement responsibility in the state under the Safe Drinking Water Act. 42 U.S.C. § 300g-2(a). On an annual basis, "the Administrator shall review, with respect to each State determined to have primary enforcement responsibility, the compliance of the State with the requirements set forth in 40 CFR part 142, subpart B, and the approved State primacy program." 40 C.F.R. § 142.17(a)(1). When the Administrator determines, based on this review "or other available information," that a state no longer meets the regulatory requirements for primacy, "the Administrator shall initiate proceedings to withdraw primacy approval." 40 C.F.R. § 142.17(a)(2).

34.     The primacy program requires that Arkansas adopt and implement adequate procedures to include a "systematic program for conducting sanitary surveys of public water systems in the State." 40 C.F.R. § 142.10(b)(1). States must also have the authority to require public water systems (PWSs) to respond to and address significant deficiencies identified in sanitary survey reports. *See* 40 C.F.R. § 142.16(b)(1).

35.     The March 3 Cybersecurity Rule substantively changes "the duties of states during PWS sanitary surveys, which states are required

to perform under 40 CFR §§ 141.2, 142.16(b)(3) and 142.16(o)(2)." Rule at 7. "Sanitary surveys must evaluate those aspects of the PWS within the eight required components that are necessary for the production and distribution of safe drinking water," *Id.* at 8, that now include the cybersecurity of any operation technology used by a PWS. And "States must have the appropriate rules or other authority to assure that PWSs respond in writing to significant deficiencies outlined in sanitary survey reports." 40 C.F.R. § 142.16(b)(1)(ii). Failing to adopt EPA's new cybersecurity requirements when conducting a sanitary survey may trigger a withdrawal of primacy under 40 C.F.R. § 142.17(a)(2) and prevent a State's re-application for primacy. 40 C.F.R. § 142.16(o)(2) (In addition to other requirements, "a primacy application must describe how the State will implement a sanitary survey program that meets the requirements of paragraph (o)(2)(i) of this section.").

36.    The loss of primacy has substantial consequences. "Whenever the Administrator makes a final determination pursuant to section 300-2g(b)of this title that the requirements of section 300-2g(a) of this title are no longer being met by a State, additional grants for such State under this subchapter shall be immediately terminated by the Administrator."

42 U.S.C. 300j-12(a)(1)(F). Arkansas estimates that the loss of primacy would jeopardize millions in grants and funding.

37.   Iowa has more than one thousand community water systems, all of which could conceivably be affected by the Cybersecurity Rule. Iowa estimates that more than 1,300 very small public water supplies and hundreds of small public water supplies will be affected by the rule change.  Iowa estimates that every public water supply facility in the State will be impacted to some degree by this new rule interpretation.

38.   The Cybersecurity Rule imposes significant costs on the Iowa Department of Natural Resources, including additional staff hours and resources that would be required to complete each sanitary survey due to EPA's new cybersecurity rule.

39.   Iowa completes approximately almost 2,000 sanitary surveys each year.  It estimates that implementing EPA's new requirements for sanitary surveys will require between two and six additional hours for each survey.  The State estimates that it may need to spend millions of dollars to hire additional staff to perform the cybersecurity analysis and to accommodate the additional time required to perform the expanded sanitary surveys.

40.     Iowa has primary enforcement responsibility in the state under the Safe Drinking Water Act. 42 U.S.C. § 300g-2(a). On an annual basis, "the Administrator shall review, with respect to each State determined to have primary enforcement responsibility, the compliance of the State with the requirements set forth in 40 CFR part 142, subpart B, and the approved State primacy program." 40 C.F.R. § 142.17(a)(1). When the Administrator determines, based on this review "or other available information," that a state no longer meets the regulatory requirements for primacy, "the Administrator shall initiate proceedings to withdraw primacy approval." 40 C.F.R. § 142.17(a)(2).

41.     The primacy program requires that Iowa adopt and implement adequate procedures to include a "systematic program for conducting sanitary surveys of public water systems in the State." 40 C.F.R. § 142.10(b)(1). States must also have the authority to require a PWS to respond to and address significant deficiencies identified in sanitary survey reports. *See* 40 C.F.R. § 142.16(b)(1).

42.     The March 3 Cybersecurity Rule substantively changes "the duties of states during PWS sanitary surveys, which states are required to perform under 40 CFR §§ 141.2, 142.16(b)(3) and 142.16(o)(2)." Rule

at 7. "Sanitary surveys must evaluate those aspects of the PWS within the eight required components that are necessary for the production and distribution of safe drinking water," *id.* at 8, that now include the cybersecurity of any operation technology used by a PWS. And "States must have the appropriate rules or other authority to assure that PWSs respond in writing to significant deficiencies outlined in sanitary survey reports." 40 C.F.R. § 142.16(b)(1)(ii). Failing to adopt EPA's new cybersecurity requirements when conducting a sanitary survey may trigger a withdrawal of primacy under 40 C.F.R. § 142.17(a)(2) and prevent a State's re-application for primacy. 40 C.F.R. § 142.16(o)(2) (In addition to other requirements, "a primacy application must describe how the State will implement a sanitary survey program that meets the requirements of paragraph (o)(2)(i) of this section.").

43.  The loss of primacy has substantial consequences. "Whenever the Administrator makes a final determination pursuant to section 300-2g(b) of this title that the requirements of section 300-2g(a) of this title are no longer being met by a State, additional grants for such State under this subchapter shall be immediately terminated by the Administrator." 42 U.S.C. 300j-12(a)(1)(F).

## EPA's Order or Rule to be Reviewed

44.    On March 3, 2023, Assistant Administrator Radhika Fox issued the Cybersecurity Rule entitled "Addressing PWS Cybersecurity in Sanitary Surveys or an Alternate Process" to State Drinking Water Administrators, Water Division Directors, Regions I-X.

45.    In the Cybersecurity Rule, EPA "clarifies" "that states must evaluate the cybersecurity of operational technology used by a PWS when conducting PWS sanitary surveys or through other state programs." Cybersecurity Rule at 1. It explained that a sanitary survey is "an onsite review of the water source, facilities, equipment, operation, and maintenance of a PWS for the purpose of evaluating the adequacy of such source, facilities, equipment, operation, and maintenance for producing and distributing safe drinking water." *Id.* at 2.

46.    The March 3 Cybersecurity Rule announces that, now, "EPA interprets the regulatory requirements relating to the conduct of sanitary surveys to require that when a PWS uses operational technology, such as an industrial control system (ICS), as part of the equipment or operation of any required component of a sanitary survey, then the sanitary survey of that PWS must include an evaluation of the adequacy of the

cybersecurity of that operational technology for producing and distributing safe drinking water." *Id.* This is the new Cybersecurity Rule.

47. EPA ordered that "states must do the following to comply with the requirement to conduct a sanitary survey" for PWSs that use an industrial control system or other operation technology:

a. "[E]valuate the adequacy of the cybersecurity of that operational technology for producing and distributing safe drinking water"; and

b. "If the state determines that a cybersecurity deficiency identified during a sanitary survey is significant, then the state must use its authority to require the PWS to address the significant deficiency."

Cybersecurity Rule. at 2–3.

48. EPA then states that "significant deficiencies should include the absence of a practice or control, or the presence of a vulnerability, that has a high risk of being exploited, either directly or indirectly, to compromise an operational technology used in the treatment or distribution of drinking water." *Id.* at 3.

49.   Although EPA has provided options for States to choose between, EPA requires States to choose one to be compliant. Cybersecurity Rule at 4–6 (detailing Options 1a, 1b, 2, and 3). All three options impose costs on either the State or the PWSs.

## **GROUNDS FOR REVIEW**

50.   The new Cybersecurity Rule's modifications to the Safe Drinking Water Act are procedurally and substantively unlawful.

51.   Missouri challenges EPA's substantive modifications to 40 C.F.R. §§ 141.2, 142.16(b)(3) & (o)(2) as unlawful because EPA promulgated the legislative rule without notice and comment procedures required by the Administrative Procedure Act, violated other statutory obligations, exceeded its statutory authority under the Safe Drinking Water Act, and other acts of Congress, and its decision is arbitrary and capricious.

52.   The Cybersecurity Rule's changes to "equipment" and "operations" are not authorized by any new statute or decisional law even though Congress continues to consider policy options on cybersecurity vulnerabilities. Since 2002, Congress has required drinking water

systems to assess risks that could disrupt the provision of a safe and reliable water supply and prepare plans to address such risks. In 2018, the AIWA rewrote those requirements and now community water systems serving more than 3,300 persons to conduct a risk and resilience assessment that includes "the resilience of … electronic, computer, or other automated systems (including the security of such systems) which are utilized by the system." 42 U.S.C. § 301-2.

53.    In 2021, Congress provided funds for the "Midsize and Large Drinking Water System Infrastructure Resilience and Sustainability Program" to "reduc[e] cybersecurity vulnerabilities." 42 U.S.C. § 300j-19g(b)(2). And it required that EPA and the Cybersecurity Infrastructure Security Agency report to Congress a prioritization framework to identify PWSs that could "lead to significant impacts on the health and safety of the public" and a technical cybersecurity support plan to identify cybersecurity priorities and resources to provide PWSs. 42 U.S.C. § 300g-10. But neither statute authorized to EPA to implement the Cybersecurity Rule. 42 U.S.C. § 300g-10(c) (Nothing in this section "alters the existing Authorities of the Administrator.").

54.     After the AIWA, EPA did not indicate that the statute imposed cybersecurity assessments to sanitary surveys. Indeed, its 2019 publication, *How to Conduct a Sanitary Survey of Drinking Water Systems,*[1] mentioned computers only four times and did not mention the internet or cybersecurity at all. And EPA cites no new statutory authority to support its new Cybersecurity Rule. That is because there is none; EPA now claims it has had this authority all along.

55.     The EPA action impermissibly forces States to impose new and cumbersome requirements on PWSs on the threat of ending millions in funding and ending the States' role as the primary enforcer of drinking water regulations.

56.     Petitioners will supplement the Petition in its briefing as necessary.

---

[1] *Available at* https://www.epa.gov/sites/default/files/2019-08/documents/sanitary_survey_learners_guide_508_8.27.19.pdf.

## RELIEF REQUESTED

57.   The States request that the Court hold that the new Cybersecurity Rule is unlawful and set it aside, and any other relief that the Court deems just.

Dated:  April 17, 2023          Respectfully submitted,

**ANDREW BAILEY**
Missouri Attorney General

*/s/ Jeff P. Johnson*

Jeff P. Johnson, Mo. Bar No. 73249
  Deputy Solicitor General
Richard Groeneman,
Mo. Bar No. 57157
Timothy Duggan, Mo. Bar No. 27827
  Assistant Attorneys General
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (314) 340-7366
Fax: (573) 751-0774
Jeff.johnson@ago.mo.gov
*Counsel for Petitioner State of Missouri*

**TIM GRIFFIN**
Arkansas Attorney General

Dylan L. Jacobs, AR2016167
  Deputy Solicitor General
Michael A. Cantrell, AR2012287
  Assistant Solicitor General
Arkansas Attorney
General's Office       ·
323 Center Street, Suite 200
Little Rock, AR 72201
Phone: (501) 682-2007
Dylan.jacobs@arkansasag.gov

*Counsel for Petitioner*
*State of Arkansas*

**BRENNA BYRD**
Iowa Attorney General

Eric H. Wessan, IA #AT0014313
  Solicitor General
Iowa Attorney General's Office
1305 E. Walnut Street
Des Moines, IA 50319
Phone: (515) 823-9117
eric.wessan@ag.iowa.gov

*Counsel for Petitioner*
*State of Iowa*