IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

| | |
|---|---|
| STATE OF MISSOURI, *et al.*,<br><br>     Petitioners,<br><br>AMERICAN WATER WORKS<br>ASSOCIATION, *et al.*<br><br>     Intervenors,<br><br>v.<br><br>U.S. ENVIRONMENTAL<br>PROTECTION AGENCY, *et al.*<br><br>     Respondents. | No. 23-1787 |

**<u>RESPONSE TO INTERVENORS' MOTION TO STAY</u>**

**TABLE OF CONTENTS**

Introduction                                                                 1

Background                                                                   3

  I.    Statutory Background                                              3

  II.   Procedural Background                                            5

    A.  The Cybersecurity Memorandum                           5
    B.  Procedural History                                             7

Argument                                                                     7

  I.    The Motion Should be Denied on Venue Grounds.              8

  II.   The Associations Are Not Entitled to a Stay.              9

    A.  The Associations are unlikely to succeed on the merits.       9
    B.  The Associations have not shown that all their members will suffer irreparable harm absent a stay.                               15
    C.  The equities and the public interest weigh against a stay.     22

Conclusion                                                                  24

# TABLE OF AUTHORITIES

**Cases**

*Am. Hosp. Ass'n v. Harris*,
  625 F.2d 1328 (7th Cir. 1980) ............................................................17

*Ark. Peace Ctr. v. Ark. Dep't of Pollution Control*,
  992 F.2d 145 (8th Cir. 1993) ..............................................................22

*Catholic Health Initiatives v. Sebelius*,
  617 F.3d 490 (D.C. Cir. 2010) ............................................................11

*Chlorine Inst., Inc. v. Soo Line R.R.*,
  792 F.3d 903 (8th Cir. 2015) ..............................................................20

*Eggers v. Evnen*,
  48 F.4th 561 (8th Cir. 2022) ...............................................................22

*H&R Block, Inc. v. Block, Inc.*,
  58 F.4th 939 (8th Cir. 2023) ............................................... 8, 16, 21, 22

*In re Sac & Fox Tribe of Miss. In Iowa/Meskwaki Casino Litig.*,
  340 F.3d 749 (8th Cir. 2003) ..............................................................23

*Iowa League of Cities v. EPA*,
  711 F.3d 844 (8th Cir. 2013) ................................................. 10, 11, 13

*Iowa Utils. Bd. v. F.C.C.*,
  109 F.3d 418 (8th Cir. 1996) ................................................. 15, 16, 17

*Laclede Gas Co. v. St. Charles Cnty., Mo.*,
  713 F.3d 413 (8th Cir. 2013) ..............................................................22

*Maybelline Co. v. Noxell Corp.*,
  813 F.2d 901 (8th Cir. 1987) ................................................................8

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ..............................................................................7

*Morehouse Enters., LLC v. Bureau of Alcohol, Tabacco, Firearms & Explosives*,
No. 3:22-cv-116, 2022 WL 3597299 (D.N.D. Aug. 23, 2022) ..........................17

*Nken v. Holder*,
556 U.S. 418 (2009).............................................................................. 7, 8, 9, 22

*Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant*,
760 F.2d 312 (D.C. Cir. 1985) ...........................................................................8

*Packard Elevator v. I.C.C.*,
782 F.2d 112 (8th Cir. 1986) ...................................................................... 15, 20

*Padda v. Becerra*,
37 F.4th 1376 (8th Cir. 2022) ............................................................... 15, 20, 21

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015).................................................................................... 10, 13

*Planned Parenthood Minn., N.D., S.D. v. Rounds*,
530 F.3d 724 (8th Cir. 2008) ..............................................................................9

*Rodgers v. Bryant*,
942 F.3d 451 (8th Cir. 2019) ..............................................................................9

*State of Nebraska ex rel. Stenberg v. United States*,
238 F.3d 946 (8th Cir. 2001) ..............................................................................4

*Voyageurs Nat'l Park Ass'n v. Norton*,
381 F.3d 759 (8th Cir. 2004) ............................................................................13

*Watkins Inc. v. Lewis*,
346 F.3d 841 (8th Cir. 2003) ............................................................................16

**Statutes**

5 U.S.C. § 553 .................................................................................................9, 10

42 U.S.C. § 300f................................................................................... 3, 4, 13

42 U.S.C. § 300g-1.............................................................................................4

42 U.S.C. § 300g-2...................................................................................4

42 U.S.C. § 300i-2 ............................................................................ 14, 15

42 U.S.C. § 300j-7 ............................................................................ 3, 7, 8

Pub. L. 115-270...................................................................................14

N.J. Stat. Ann. § 58:31-1 *et seq.* ...............................................................19

**Rules**

Fed. R. App. P. 15 ..................................................................................7

Fed. R. App. P. 27 .................................................................................25

Fed. R. App. P. 32 .................................................................................25

**Code of Federal Regulations**

40 C.F.R. § 141.2 ................................................................. 2, 3, 4, 11, 14

40 C.F.R. § 141.401 ........................................................ 4, 11, 12, 14, 15

40 C.F.R. § 141.723 .................................................................................5

40 C.F.R. § 142.16 ............................................................... 2, 6, 5, 11

**OTHER MATERIALS**

Wright & Miller, Federal Practice & Procedure § 3921 (1977) ...................8

**INTRODUCTION**

In 2021, a hacker used the credentials of a former California water treatment plant employee to gain access to the plant's remote network and deleted the programs that allowed the facility to treat drinking water. Ex. 1, A.R. Doc. 5. That same year, an Ohio water department discovered an unidentified actor remotely controlling the city's water pump controls and attempting to disconnect the computer. *Id*. In 2019, a former employee logged into an online control system for a Kansas public water system and tried to shut down its cleaning and disinfection operations. *Id*.

As cyber threats to critical infrastructure have increased in recent years, public water systems have not been immune. Public water systems increasingly rely on "operational technology"—"hardware and software that detects or causes a change through the direct monitoring or control of physical devices, processes, and events in the enterprise," Ex. 2, A.R. Doc. 1, Cybersecurity Memorandum ("Memo.") at 1 n.8—to operate the equipment that processes, treats, and delivers drinking water, Ex. 3, A.R. Doc. 4. Malicious cyber activity can disrupt that operational technology and threaten systems' ability to provide clean, potable drinking water that complies with Safe Drinking Water Act ("SDWA") requirements. *Id*.

The Environmental Protection Agency's ("EPA") national primary drinking water regulations establish requirements to conduct "sanitary surveys" of public drinking water systems. A sanitary survey is "an onsite review of the water source, facilities, equipment, operation and maintenance of a public water system for the purpose of evaluating" those components' adequacy for "producing and distributing safe drinking water." 40 C.F.R. § 141.2. Sanitary surveys have traditionally included a review of the security of pump stations, storage tanks, and other covered components. *See, e.g.*, Ex. 4, A.R. Doc. 11 at 5-18–19, 10-8.

In March 2023, EPA Assistant Administrator for Water Radhika Fox issued a memorandum entitled "Addressing [Public Water System] Cybersecurity in Sanitary Surveys or an Alternate Process" ("Memorandum"). Ex. 2. The Memorandum states EPA's interpretation that sanitary surveys must account for cyber threats to public water system security. Specifically, the Memorandum states SDWA sanitary surveys must evaluate "the adequacy of the cybersecurity" of a public water system's "operational technology for producing and distributing safe drinking water." *Id*. at 3. By extension, if a sanitary survey reveals a significant deficiency in cybersecurity at a public water system, EPA or a state with primary SDWA enforcement authority must use its authority to address the deficiency. *Id*. (citing 40 C.F.R. § 142.16(b)(1)–(3), (o)(1)–(2)).

Movants American Water Works Association ("AWWA") and National Rural Water Association ("NRWA") (together, the "Associations") failed to seek judicial review of EPA's Memorandum during the 45-day limitations period that Congress prescribed for review of final agency actions taken under the SDWA. *See* 42 U.S.C. § 300j-7(a). But they were granted a reprieve when three States—who have not moved for a stay—petitioned this Court for review, giving the Associations the chance to intervene in support of the petition after the statutory deadline to file their own suit. The Associations have opposed EPA's pending motion to transfer venue to the D.C. Circuit, arguing that the Eighth Circuit should "respect Petitioners' chosen forum" and that "case-specific factors" make regional-circuit review appropriate. Dkt. 5283645, at 21. Yet now the Associations, whose unexplained delay in seeking review would have doomed their challenge but for the happenstance of other parties petitioning, claim "substantial, irreparable harm" from the Memorandum, Mot. at 1, and ask this Court to stay its application against all their members *nationwide*. That request should be denied.

## BACKGROUND

## I. Statutory Background

The SDWA and EPA's implementing regulations establish standards and treatment requirements for public water systems and protect underground drinking water sources. A "public water system" is "a system for the provision to the public

of water for human consumption through pipes or other constructed conveyances, if such system has at least fifteen service connections or regularly serves at least twenty-five individuals." 42 U.S.C. § 300f(4)(A); *see also* 40 C.F.R. § 141.2.

The SDWA is implemented, in part, through EPA's primary drinking water regulations, which "establish the procedures necessary to treat contaminants that pose an adverse effect on human health." *State of Nebraska ex rel. Stenberg v. United States*, 238 F.3d 946, 947 (8th Cir. 2001) (citing 42 U.S.C. § 300g-1). Those regulations must contain "criteria and procedures to assure a supply of drinking water which dependably complies with such maximum contaminant levels; including accepted methods for quality control and testing procedures to insure compliance with such levels and to insure proper operation and maintenance of the system." 42 U.S.C. § 300f(1)(D).

To accomplish that, EPA has promulgated requirements for sanitary surveys, during which EPA, or a state that has been granted primary SDWA enforcement authority (a "primacy state"), *see id.* § 300g-2, evaluates a public water system's "water source, facilities, equipment, operation, and maintenance" to assess the adequacy of those components for providing safe drinking water. 40 C.F.R. § 141.2. Sanitary surveys are conducted every three to five years, Ex. 2, Memo. at 5, and evaluate eight required components: source water; treatment; distribution system; finished water storage; pumps, pump facilities and controls; monitoring,

reporting, and data verification; system management and operation; and operator compliance with State requirements. 40 C.F.R. § 141.401(c); *see also id*. §§ 142.16(b)(3)(i), (o)(2). EPA's regulations also require public water systems to respond to significant deficiencies identified in sanitary surveys. *Id*. § 141.723.

In 1999 and 2019, EPA issued guidance manuals on how to conduct sanitary surveys. The manuals recommend that surveyors assess public water systems' security practices relating to treatment, storage, pumps, and operations. Ex. 4, A.R. Doc. 11; Ex. 5, A.R. Doc. 62.

## II.    Procedural Background

### A.    The Cybersecurity Memorandum

The Memorandum communicates EPA's interpretation of existing sanitary survey regulations. It states that "the regulatory requirement to review the 'equipment' and 'operation'" of a public water system "necessarily encompasses a review of the cybersecurity practices and controls needed to maintain the integrity and continued functioning of operational technology of the [public water system] that could impact the supply or safety of the water provided to customers." Ex. 2, Memo. at 2. Put differently, to be consistent with EPA's regulations, a "sanitary survey" must evaluate "the adequacy of the cybersecurity" of the system's "operational technology for producing and distributing safe drinking water." *Id*. Relatedly, if a sanitary survey identifies a significant deficiency in cybersecurity,

EPA's existing regulations would require that a primacy state use its authority to address the deficiency. *Id*. (citing 40 C.F.R. §§ 142.16(b)(1)–(3), (o)(1)–(2)).

Although sanitary surveys necessarily encompass cybersecurity assessments, EPA explained that "States retain their existing flexibility with sanitary surveys in how they evaluate [public water systems], identify significant deficiencies, and require [systems] to address significant deficiencies." Ex. 2, Memo. at 3. The Memorandum describes three nonexclusive approaches for evaluating and responding to cybersecurity issues under EPA's existing regulations. *Id*. at 3–5.

The Memorandum also describes the guidance, training, and technical and financial assistance resources available to assist in the evaluation of cybersecurity during sanitary surveys. *Id*. at 5–6. That includes a guidance document, "Evaluating Cybersecurity In Public Water System Sanitary Surveys," issued concurrently with the Memorandum. Ex. 6, A.R. Doc. 2 ("Cybersecurity Guidance"). The Guidance (not challenged here) includes "an optional checklist of cybersecurity practices that could be used" to assess, identify, and respond to potential significant deficiencies regarding cybersecurity. Ex. 2, Memo. at 6. EPA emphasized that the "use of all EPA guidance by [public water systems] and states is optional." *Id*.

## B.     Procedural History

Petitions for review of final EPA action under the SDWA must be filed within 45 days. 42 U.S.C. § 300j-7(a). On the 45th day, the States of Missouri, Arkansas, and Iowa petitioned for review of the Memorandum. Dkt. 5266116. A person may intervene in support of another's petition for review within 30 days. Fed. R. App. P. 15(d). The Associations moved to intervene in support of the petition on the 30th day, Dkt. 5278070, and were granted leave to do so, Dkt. 5281165.

EPA moved to transfer venue over this action to the D.C. Circuit, Dkt. 5280991, and the Court entered an order carrying that motion with the case, Dkt. 5284742. Now, the Associations, supported but not joined by State Petitioners, move this Court to stay the Memorandum's application against all their members.

## ARGUMENT

A stay is unwarranted. First, venue is improper as explained in EPA's venue motion, and a court without venue should not award preliminary injunctive relief. Second, the Associations fail to make a "clear showing" that the "extraordinary and drastic remedy" of a stay is appropriate. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). "A stay is an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter or right, even if irreparable injury might otherwise result[.]" *Nken v. Holder*, 556 U.S. 418, 427 (2009)

(citations omitted). All four factors for determining whether a stay should issue—
(1) strong likelihood of success on the merits, (2) irreparable injury to the movant
absent a stay, (3) the balance of the equities, and (4) the public interest—weigh
against a stay. *See id.*; *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 946 (8th Cir.
2023).

## I.      The Motion Should be Denied on Venue Grounds.

The SDWA vests exclusive venue in the D.C. Circuit to review EPA actions,
like the Memorandum, which "pertain[] to the establishment of national primary
drinking water regulations." *See* 42 U.S.C. § 300j-7(a)(1). *See* Dkt. 5280991.
Venue is "inextricably bound up with the remedial decision" of whether a stay
should issue. *Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant*, 760 F.2d
312, 315 (D.C. Cir. 1985) (quoting WRIGHT & MILLER, FEDERAL PRACTICE &
PROCEDURE § 3921, at 17 (1977)); *see also Maybelline Co. v. Noxell Corp.*, 813
F.2d 901, 902–03 (8th Cir. 1987) (vacating preliminary injunction on venue
grounds). For example, whether the Associations are likely to succeed on the
merits turns on the law in the forum where the merits must be decided. This Court
should therefore either deny the Stay Motion or transfer it to the D.C. Circuit with
the underlying petition.

## II.  The Associations Are Not Entitled to a Stay.

### A.  The Associations are unlikely to succeed on the merits.

The Associations must demonstrate sufficient likelihood of success on the merits. In some circumstances, this Court requires a movant to show a "fair chance" of success. *Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019). But where a movant seeks to enjoin "government action based on presumptively reasoned democratic processes," it must show that it is "likely to prevail on the merits." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008) (en banc). Indeed, in a case seeking a stay of an agency's removal order, the Supreme Court noted that a mere "possibility" of relief is "too lenient" to justify "the extraordinary remedy of injunction." *Nken*, 556 U.S. at 432, 434–35.

The Memorandum represents EPA's interpretation of longstanding regulations "developed through presumptively reasoned democratic processes" and thus "should not be enjoined lightly." *Planned Parenthood Minn.*, 530 F.3d at 732. Nevertheless, under any standard, the Associations are not likely to succeed on the merits.

### 1.  The Memorandum is procedurally lawful.

The Associations first argue that the Memorandum is a legislative rule unlawfully promulgated without the notice and comment required by the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(b)(1)–(3). They are wrong.

The Memorandum is an "interpretative rule[]," *id.* § 553(b)(A), designed to "advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (internal quotation omitted). Accordingly, APA notice-and-comment requirements do not apply. *Id*. at 95, 101 (holding that notice and comment rulemaking procedures do not apply when an agency issues, amends, or repeals a rule that simply interprets regulations).

This Court distinguishes interpretive from legislative rules by considering how the agency characterizes its action, whether the action has binding effects on third parties, and whether the action "substantively amends or adds to, versus simply interpreting the contours of, a preexisting rule." *Iowa League of Cities v. EPA*, 711 F.3d 844, 872–73 (8th Cir. 2013).

The Memorandum exhibits all the characteristics of an interpretive rule. First, EPA characterized its action as interpretive, and that characterization is "entitled to some deference." *Id.* at 872. The Memorandum states that EPA "*interprets* the regulatory requirements relating to the conduct of sanitary surveys," and that its "interpretation clarifies . . . the regulatory requirement to review the 'equipment' and 'operation' of a [public water system]." Ex. 2, Memo. at 2 (emphasis added).

Second, the Memorandum does not bind third parties. EPA's preexisting sanitary-survey regulations require review of a public water system's "facilities, equipment, operation, maintenance, and monitoring compliance." 40 C.F.R. § 141.401(b); *see also id*. § 142.16(b)(3). Those regulations, not the Memorandum, are the "external legal basis" that ultimately "drive[s] compliance." *Iowa League of Cities*, 711 F.3d at 874.

Third, this is not a case where EPA has "announced" a "specific application" of otherwise "vague or vacuous terms," Mot. at 9 (cleaned up), like "fair and equitable," "just and reasonable," or "in the public interest." *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 494–45 (D.C. Cir. 2010). Legislative authority may be necessary to imbue such nebulous standards with specific meaning. *See id*. But here, EPA interpreted regulations that declare *what* is to be reviewed—a public water system's "water source, facilities, equipment, operation and maintenance"—and for what purpose—"evaluating the adequacy" of those elements "for producing and distributing safe drinking water." 40 C.F.R. §§ 141.2, 141.401, 142.16(b)(3). Those regulations further list specific components to be evaluated, like "treatment including corrosion control treatment and water quality parameters as applicable," the "distribution system," "finished water storage," "pumps, pump facilities, and controls," and "system management and operation." *Id*. §§ 141.401, 142.16(o)(2).

Adequately evaluating those components reasonably includes assessing how secure they are against physical or cyber tampering. Sanitary surveys must assess the security of the required components. For example, EPA's 2019 guide, "How to Conduct a Sanitary Survey of Drinking Water Systems," recommends that surveyors consider whether pump stations and storage tanks are "protected against vandalism and intrusion." Ex. 4, A.R. Doc. 11 at 5-18–19 (pump stations), 10-8 (storage tanks). Surveyors also consider whether there are adequate site protection measures like locks, alarms, and fencing to prevent and detect intrusion and tampering. *Id*. at 2-18 (site plans and records), 3-16 (source water wells), 3-21 (spring water sources), 15-5. EPA's 1999 Guidance Manual discusses similar considerations. Ex. 5, A.R. Doc. 62.

In the Memorandum, EPA makes the unremarkable finding that, to evaluate a public water system's ability to provide safe drinking water, a sanitary survey must consider security against physical *and* non-physical intrusions. *See* 40 C.F.R. § 141.401(b). The Associations do not dispute that sanitary surveys' mandate to review "operation" and "equipment" should encompass a review of physical-security practices. *See* Mot. at 9. But as public water systems adopt technology for the "operation" and "equipment" used to treat and distribute drinking water, the same security considerations apply: If a system previously secured its critical

treatment equipment with a physical gate, it must likewise secure the digital gates of its operational technology against cyberattacks.

The Memorandum therefore does not break new ground or, as the Associations suggest (at 7), create new or materially different requirements. It merely "interpret[s] the contours of" EPA's preexisting sanitary survey rules. *Iowa League of Cities*, 711 F.3d at 873; *see also Perez*, 575 U.S. at 103–04 (rejecting argument that interpretation "amends" the underlying regulation). As such, notice and comment were not required.

### 2. The Memorandum is substantively lawful.

The Associations likewise are wrong that the Cybersecurity Memorandum is arbitrary, capricious, and exceeds EPA's statutory authority. APA review of agency's action is "limited"; if "an agency's determination is supportable on any rational basis, [the Court] must uphold it." *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004) (internal quotation and citation omitted).

The Memorandum's legal interpretations are reasonable and comport with EPA's statutory and regulatory authority. The SDWA requires EPA to establish "procedures to assure a supply of drinking water" that will comply with prescribed levels and "insure proper operation and maintenance of the system." 42 U.S.C. § 300f(1)(D). To that end, EPA has promulgated regulations requiring sanitary surveys to address public water systems' "water source, facilities, equipment,

operation and maintenance" to assess whether those components can reliably produce and distribute safe drinking water. 40 C.F.R. §§ 141.2, 141.401. The Memorandum is a reasonable interpretation, consistent with EPA's statutory mandate (and its past practice, *see supra*, page 12), of how EPA's regulations apply as public water systems adopt new technologies and face corresponding new security threats.

The risk and resilience assessments required under the America's Water Infrastructure Act ("AWIA"), Pub. L. 115-270, *codified at* 42 U.S.C. § 300i-2, do not constrain EPA's authority or responsibility to use sanitary surveys to assess public water systems' availability to provide safe drinking water. AWIA requires community water systems serving more than 3,300 persons to "conduct an assessment of the risks to, and resilience of, its system." 42 U.S.C. § 300i-2(a)(1). AWIA does not address EPA's or primacy states' ability to conduct assessments under other authorities. Nor is AWIA directly concerned with EPA's administration of SDWA drinking water regulations.

Indeed, the AWIA assessment covers many of the same, uncontroversial components that have long been reviewed under EPA's sanitary survey regulations. In addition to "the risk to the system from malevolent acts and natural hazards," AWIA assessments must address "the resilience of the pipes and constructed conveyances," among other physical aspects of the facility, "the

14

monitoring practices of the system," and "the operation and maintenance of the system." *Id*. at § 300i-2(a)(1)(A)(i), (ii), (iii), (vi). By comparison, sanitary surveys must evaluate the "distribution system," "pumps, pump facilities, and controls," and "system management and operation." 40 C.F.R. § 141.401.

Congress did not silently limit or repeal EPA's longstanding sanitary survey regulations (which apply to EPA and primacy States) by enacting new risk and resilience assessment requirements (which apply to public water systems). By the same measure, Congress did not silently hamstring EPA's ability to ensure that sanitary surveys address the security of the components that ensure that public water systems can meet SDWA regulations—whether the security threat is physical or cyber.

The Associations are accordingly unlikely to succeed on the merits.

## B.    The Associations have not shown that all their members will suffer irreparable harm absent a stay.

To establish irreparable harm, the Associations must demonstrate injury that is "certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996). The harm alleged "must be actual and not theoretical." *Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986); *see also Padda v. Becerra*, 37 F.4th 1376, 1384 (8th Cir. 2022) (explaining that harm must be "more than mere possibility" and based on more than "speculation"). This Court has declined to find irreparable

harm where alleged harms are described in such "general terms," *Watkins Inc. v. Lewis*, 346 F.3d 841, 846 (8th Cir. 2003), that there is an overall "paucity of evidence" of harm, *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 950–51 (8th Cir. 2023). Lack of irreparable harm is "an independently sufficient ground" for denying a stay. *Watkins*, 346 F.3d at 844.

The Associations, who failed to challenge the Memorandum during the statutory review window, have not met their burden to show irreparable harm. They contend that, absent a stay, all their members will: (1) "expend unrecoverable time and resources to alter their cybersecurity systems," or (2) "risk a finding of significant deficiency" thus incurring "associated monetary, operations, and reputational harms." Mot. at 16. But neither the record nor the Associations' declarations show that their members' harms are sufficiently concrete, great, and imminent to establish "a clear and present need," *Iowa Utils.*, 109 F.3d at 425, for the extraordinary relief of a stay.

### 1. The alleged compliance costs are not concrete, great, or sufficiently imminent to warrant a stay.

The Associations' contention that their members will expend unrecoverable resources understanding and implementing the Memorandum's recommendations does not establish irreparable harm. *First*, "ordinary compliance costs" like reviewing the Memorandum and ensuring that practices align with EPA's regulations "are typically insufficient to constitute irreparable harm." *Morehouse*

16

*Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 3:22-cv-116, 2022 WL 3597299, at *12 (D.N.D. Aug. 23, 2022) (cleaned up); *see also Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) ("[I]njury resulting from attempted compliance with government regulation ordinarily is not irreparable harm.").

*Second*, the record shows that purported costs to the Associations' members are neither "imminent" nor "great" enough to constitute irreparable harm. *Iowa Utils.*, 109 F.3d at 425. Excepting AWWA member Ames, Iowa Water and Pollution Control Department, which anticipates a sanitary survey in 2023, *see* Mot. Ex. I, ¶ 13,[1] no public water system that submitted declarations is imminently facing a sanitary survey that would address cybersecurity consistent with the Memorandum. The only other system that provided a concrete date expects its next survey in 2024, by which time the merits can be adjudicated in the ordinary course. Mot. Ex. L ¶ 12.

Additionally, the declarations largely omit concrete estimates of the costs the Associations' members expect to incur, how many members will incur such costs,

---

[1] The Ames public water system already has cybersecurity practices, but its declarant estimates that Ames will likely increase its information technology budget by $20,000 a year to adopt the "few" recordkeeping and inventory controls listed in the Guidance that they do not presently have in place. Mot. Ex. I. ¶¶ 20, 23. Those allegations are insufficient to demonstrate irreparable harm because the Memorandum does not require public water systems to adopt all listed controls in the Guidance. *See infra*, page 20.

or the magnitude of those costs relative to members' overall capital expenditures, baseline operational technology budgets, or another relevant comparator. The only four declarations that include cost figures describe minimal expected costs. Those declarations assert that those four systems of varying sizes expect to spend between $15,000 and $100,000 implementing measures recommended in either EPA's Memorandum or its (unchallenged) Guidance. *See* Mot. Ex. E ¶ 20; Mot. Ex. F ¶ 22; Mot. Ex. G ¶ 21; Mot. Ex. I ¶ 23.

The low cost estimates are unsurprising. *First*, most of the cybersecurity countermeasures described in EPA's optional Guidance entail changes in procedures and practices rather than significant capital expenditures. For example, the Guidance recommends that public water systems revoke access credentials for former employees and change factory default passwords on key operational technology assets. *Second*, most public water systems have already invested in cybersecurity systems and practices. Both AWWA and NRWA attest that their members have "some level of investment" in, and "many years of experience with," cybersecurity. Mot. Ex. A ¶ 36; Mot. Ex. B ¶ 50. The individual public water system declarants note that they "have measures in place to address cybersecurity concerns . . . . tailored to its specific operational needs." *See e.g.*, Mot. Ex. E ¶ 17; Mot. Ex. F. ¶ 16; Mot. Ex. G ¶¶ 17–18. Many States have independent requirements to ensure that public water systems have adopted

18

cybersecurity practices. Mot. Ex. A ¶ 26; *see, e.g.*, N.J. Stat. Ann. § 58:31-1 *et seq.*; Minn. Executive Order 22-20, https://mn.gov/governor/assets/EO%2022-20 _tcm1055-539386.pdf.

Preexisting cybersecurity practices diminish water systems' need for, and cost of, adopting additional measures in response to the Memorandum. That variability undermines the Associations' claim of irreparable harm, as does the dearth of specific facts corroborating the Associations' assertion (at 17) of "significant" costs to implement the Memorandum's recommendations.

*Third*, the allegation of imminent, great harm is belied by the substantial financial and technical support that EPA provides to States and public water systems, which can meaningfully offset any costs that systems may incur in strengthening cybersecurity practices. EPA offers nationwide training and a technical assistance program that public water systems can use to consult with cybersecurity experts. Ex. 2, Memo. at 6. EPA also conducts cybersecurity assessments itself through its Water Sector Cybersecurity Evaluation. *Id*. at 4; *see* Ex. 7, A.R. Doc. 18. The Cybersecurity and Infrastructure Security Agency, the U.S. Department of Agriculture's Rural Development Circuit Rider program, and other federal loan and grant programs also fund projects that address cybersecurity vulnerabilities. Ex. 2, Memo. at 10–11.

The Associations provide no indication that their members have availed themselves of these external support services. That "apparent failure to try to ease [their members' claimed] burdens" "undercuts" their bid for a stay. *Padda*, 37 F.4th at 1385; *see also Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 915 (8th Cir. 2015) (affirming denial of equitable relief where movants did not "even attempt[] to find alternative ways to meet their needs . . . much less explained their efforts and their success or lack of success").

*Fourth*, the alleged compliance costs depend on the Associations' misguided assumption that their members must implement the entire 36-item checklist in EPA's preliminary (and equally non-binding) Guidance. Mot. at 18. The Memorandum neither imposes nor suggests any legal or practical consequence for missing "a few controls" listed in the Guidance. *See, e.g.*, Mot. Ex. E. ¶¶ 17–18, 21; Mot. Ex. G ¶ 22. The Guidance is not the subject of this suit, and the Associations "must show that the alleged harm will directly result from the action which the petitioner seeks to enjoin." *Packard Elevator*, 782 F.2d at 115.

Moreover, the Guidance is just that: *guidance*. It is not the *only* way States or EPA take cybersecurity into account in sanitary surveys. *See* Ex. 2, Memo. at 6 (emphasizing that the Guidance is "optional"); Ex. 6, Guidance at 1 (describing the Guidance as "optional supplementary material"). And it is

expressly preliminary, subject to an ongoing public-comment process. *Id.* at i; Memo. at 6.

### 2. The potential for future significant-deficiency findings is too attenuated to constitute irreparable harm.

The Associations' abstract fear that their members risk significant-deficiency findings if they do not immediately adopt expensive new cybersecurity practices, Mot. at 18, is exaggerated and unreasonable. The Memorandum affirms States' flexibility in evaluating public water systems, and in identifying and addressing significant deficiencies. Memo. at 3. States may allow systems "sufficient time to correct cybersecurity gaps identified in assessments and only consider issuing a significant deficiency where a [public water system] fails to correct a critical vulnerability." Ex. 6, Guidance at 11.

Nor have the Associations proffered "supporting evidence," *Padda*, 37 F.4th at 1385, of "financial, operational, and reputational harms" that may result from a significant-deficiency finding. Mot. at 19. Mere allusions to "serious ramifications are insufficient. *Id.*; *see, e.g.*, Mot. Ex. A ¶ 12; Mot. Ex. B ¶ 16; Mot. Ex. E ¶ 14. And, as to reputational harm in particular, "worry about potential negative publicity and loss of intangible assets, such as reputation and goodwill" is too "speculative and inadequate" to justify equitable relief. *H&R Block*, 58 F.4th at 952.

In sum, the Associations have not shown a sufficiently certain, great, or imminent threat of irreparable harm to warrant a stay.

**C.      The equities and the public interest weigh against a stay.**

The critical national-security and public-health concerns addressed in the Memorandum strongly disfavor a stay. A stay is warranted only when the demonstrated threat of irreparable harm to the movant outweighs the injury that a stay will inflict on other parties. *Id*. at 946. Where the United States opposes a stay, the balance-of-harms and public interest factors merge. *Nken*, 556 U.S. at 435; *Eggers v. Evnen*, 48 F.4th 561, 564–65 (8th Cir. 2022).

Even crediting the Associations' unsubstantiated allegations of harm, such harm would be outweighed by the important public-health and security interests served by the Memorandum. In balancing the equities, this Court places a premium on public interest concerns that implicate public health or safety, even in the face of substantial costs to private economic interests. *See, e.g.*, *Laclede Gas Co. v. St. Charles Cty., Mo.*, 713 F.3d 413, 420 (8th Cir. 2013) (affirming preliminary injunction to prevent removal of gas pipelines that would endanger public safety); *Ark. Peace Ctr. v. Ark. Dep't of Pollution Control*, 992 F.2d 145, 147 (8th Cir. 1993) (staying preliminary injunction given "important public interest in protecting the environment by cleaning up hazardous waste sites").

The risks to public health and critical infrastructure from staying the Memorandum are significant. AWWA has recognized that public water systems face "a direct threat" from malicious cyber activities that "threaten the security of our nation's water and wastewater systems' operations and data." Ex. 8 at 7, A.R. Doc. 15. Such cyberattacks "have the potential to disable or contaminate the delivery of drinking water to consumers and other essential facilities like hospitals." Ex. 2, Memo. at 1. By communicating clearly EPA's interpretation that sanitary surveys must assess cybersecurity practices related to operational technology, the Memorandum helps ensure public drinking water remains safe and reliable.

The Associations' suggestion that the Memorandum makes public water systems *more* vulnerable to attack by making sensitive cybersecurity information less secure, Mot. at 21, is meritless. The Memorandum both discusses EPA's use of applicable Freedom of Information Act exceptions to avoid disclosing sensitive portions of sanitary survey reports and recommends several measures States can use to avoid disclosing such information. Ex. 2, Memo. at 11, 12.

Further, this Court should give "great weight to the fact that Congress already declared the public's interest and created a regulatory and enforcement framework" in the SDWA. *In re Sac & Fox Tribe of Miss. in Iowa/Meskwaki Casino Litig.*, 340 F.3d 749, 760 (8th Cir. 2003). The Memorandum reflects EPA's

interpretation of the sanitary survey regulations that ensure that public water systems reliably provide safe drinking water. Congress gave EPA the responsibility to protect drinking water, a critical public health resource that the record shows is increasingly vulnerable to cyberattacks. The public interest in avoiding the potentially disastrous consequences of such attacks by far outweighs the Associations' alleged compliance costs. Accordingly, the balance of equities tips decidedly against a stay.[2]

## CONCLUSION

The motion for stay should be denied.

Dated: June 30, 2023

Respectfully submitted,

TODD KIM
Assistant Attorney General

/s/ *Sarah A. Buckley*
SARAH A. BUCKLEY
Trial Attorney
U.S. Department of Justice
Environment & Natural Res. Div.
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
(202) 616-7554
sarah.buckley@usdoj.gov

Counsel for Respondents

Of Counsel:
PETER Z. FORD
EPA Office of General Counsel
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

---

[2] The Court should not issue a stay, for the reasons explained herein. But any relief should, at minimum, be limited to the party-specific relief that the Associations request (and that Petitioner States have not sought). Mot. at 22.

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULES OF APPELLATE PROCEDURE 27(D) & 32(A)

This motion complies with the requirements of Fed. R. App. P. 27(d)(2) because it 5098 words, excluding any accompanying documents authorized by Fed. R. App. R. 27(a)(2)(B).

This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Sarah A. Buckley
SARAH A. BUCKLEY

## CERTIFICATE OF SERVICE

I hereby certify that June 30, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ *Sarah A. Buckley*
SARAH A. BUCKLEY